UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                    :

MANI JACOB et al.,                :
*Individually and on behalf of all others similarly*
*situated*              :       11 Civ. 0160 (JPO)
            Plaintiffs,   :
              :      MEMORANDUM AND
         -v-      :         ORDER
              :

DUANE READE, INC. and DUANE READE   :
HOLDINGS INC.,           :
           Defendants.  :
-------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiffs, individually and on behalf of all others similarly situated, assert that

Defendants Duane Reade, Inc. and Duane Reade Holdings, Inc. (collectively "DR") violated the

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and New York Labor Law §§ 650

*et seq.* ("NYLL"), by failing to compensate their assistant store managers ("ASMs") for hours

worked in excess of forty hours per week. Plaintiffs now move for class certification of their

NYLL claims pursuant to Federal Rule of Civil Procedure 23. For the reasons that follow,

Plaintiffs' motion is granted.

**I.**    **Factual Background**

      DR owns and manages approximately 250 "retail drug and consumer convenience stores"

within New York City and its surrounding metropolitan area. *Jacob v. Duane Reade, Inc.*, No.

11 Civ. 160, 2012 WL 260230, at *1 (S.D.N.Y. Jan. 27, 2012). There are currently around 750

present and former ASMs who were classified by DR as such during the relevant class period.

(Memorandum of Law in Support of Motion for Class Certification, Dkt. No. 92 (Pl.'s Mem."),

at 1, 15; Memorandum of Law in Opposition, Dkt. No. 100 ("Def.'s Opp."), at 2-3.) All ASMs

are classified as exempt from FLSA (Duane Reade Job Description, Fuchs Decl., Dkt. No. 97, Ex. 56.)  Moreover, all ASMs are uniformly, and similarly, treated as exempt from the overtime wage protections of the NYLL.  (Brooks Decl., Dkt. No. 93, Ex. D ("Costa Tr."), at 22:3-20.)

The NYLL protects employees by requiring their employers to pay a "premium rate of one and one-half times their regular rate of pay for hours worked in excess of 40 in a workweek."  (*See* Pl.'s Mem. at 11.); *see also* NYLL §§ 650 *et seq*.; N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 [,] of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended; provided, however, that the exemptions set forth in section 13(a)(2) and (4) shall not apply.").

DR and Plaintiffs agree that ASMs are classified as exempt from the overtime wage protections of the NYLL.  However, they disagree as to the soundness of this classification and the motives behind it.  Whereas DR asserts that the ASM job description accurately denotes ASMs' "duties, responsibilities, and expectations" (Def.'s Opp. at 1), Plaintiffs contend that ASMs are misclassified within a managerial role so as to maintain their exempt status within the strictures of FLSA and the NYLL.  (Pl.'s Mem. at 10-11.)  While Plaintiffs assert that such a misclassification case is ideally situated for the class action mechanism (*see generally id.*), DR argues that the individualized proof necessary to determine whether a given ASM's duties deviate from the managerial description of the position is ill-suited for class-wide determination. (Def.'s Opp. at 1-2.)  And though courts in this district have certified similar—or nearly identical—classes in the past, *see, e.g.*, *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y.2008), DR asserts that the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541 (2011) altered the landscape so as to make such certifications untenable whenever they are subject to extreme variants of individualized proof.

According to DR, ASMs' primary responsibilities include, *inter alia*: (1) "[a]ssist[ing] with the overall management of the store along with, and in the absence of, the Store Manager, and assist[ing] with directing loss prevention, merchandising, staffing, customer service, and inventory control"; (2) [a]ssist[ing] in the development and execution of strategy objectives with the Store Manager to optimize sales and profitability"; (3) "[a]ssist[ing] store manager with monitoring scheduling and budget results to achieve payroll budges"; and (4) "[p]rovid[ing] performance input and conduct[ing] annual performance appraisals for non-exempt store associates."  (Fuchs Decl., Ex. 56.)  ASMs' so-called "Supervisory Responsibilities" include "supervis[ing], develop[ing], train[ing], manag[ing][,] and motivat[ing] non-exempt store associates in accordance with Duane Reade policies and procedures" and "[r]ecruit[ing], recommend[ing] and interview[ing] qualified candidates to Store Manager."  (*Id.*)

According to DR, ASMs are "salaried, management employees," whose "primary function" is to "assist the SM and manage the day-to-day operations of the store."  (Def.'s Opp. at 3-4.)  ASMs are paid between $35,000 and $63,000 per year—a figure dependent on both individual performance and the success of their stores.  (*Id.* at 4.)

DR asserts that, during 2007 and 2008, DR initiated an "overhaul" of the ASM position, which was designed to transform the position into one of stronger management—"with better managers and leaders."  (*Id.* at 9.)  Such changes included the addition of a training program named "Leading at Duane Reade Management Essentials," and a revamping of the ASM position's educational and work qualifications.  (*Id.* at 9-10.)  Additionally, circa 2008, DR created a new position called "Shift Leader" ("SL"), which is a non-exempt position, "primarily

filled through internal promotion" (*id.* at 10), constituting an "entry level supervisory key holder position" (Costa Tr. at 80:19-81:8.)

## II.      Procedural History

Plaintiff Mani Jacob ("Jacob") filed a class action complaint in the Southern District of New York in January 2011, asserting that DR misclassified its ASMs in order to avoid paying overtime pay as required by FLSA and the NYLL. (*See* Pl.'s Mem. at 2.) At the same time, Plaintiff Lesleena Mars filed a similar complaint in the Eastern District of New York. She later voluntarily dismissed that complaint, joining Jacob's lawsuit. (*Id.*) In March 2011, Jacob filed an amended class action complaint, naming Mars as an additional plaintiff. (*See* Second Amended Class Action Complaint, Dkt. No. 25 ("Compl.").) In April 2011, DR filed its answer, asserting that its ASMs are legitimately classified as exempt administrators or executives under the FLSA and NYLL, from which it follows that they are not entitled to overtime pay. (*See* Answer to Amended Class Action Complaint, Dkt. No. 27 ("Answer").)

Plaintiffs initially moved for conditional class certification of the FLSA collective, which this Court granted on January 27, 2012. *See Jacob*, 2012 WL 260230. In *Jacob*, this Court determined that under FLSA's "modest factual showing" standard, Plaintiffs had demonstrated that they were sufficiently similarly situated to proceed collectively for the purposes of their FLSA claims. *Id.* at *8-9. Plaintiffs now move for class certification of their NYLL claims, pursuant to Rule 23 of the Federal Rules of Civil Procedure. (*See* Motion for Class Certification, Dkt. No. 91 ("Mot. Class Cert.").) DR opposes Plaintiffs' motion on the grounds that (1) Plaintiffs cannot show commonality or typicality, (2) common questions do not predominate with respect to Plaintiffs' claims, and (3) the class action is not the superior method of adjudicating these claims. (Def.'s Opp. at i.)

4

### III.    Discussion

### A.    Legal Standard

Class certification is governed by Federal Rule of Civil Procedure 23, which requires that

the party seeking certification "has satisfied the four prerequisites of Rule 23(a): numerosity,

commonality, typicality, and adequacy of representation."  *Marisol v. Giuliani*, 126 F.3d 372,

375 (2d Cir. 1997).  Additionally, a party seeking class certification must also show that at least

one of the three criteria enumerated in Rule 23(b) is satisfied.  *Id.* at 376.  Here, Plaintiffs have

sought certification under Rule 23(b)(3), which requires that "questions of law or fact common

to class members predominate over any questions affecting only individual class members."

Fed. R. Civ. P. 23(b)(3).  Moreover, Rule 23(b)(3) requires that the court find "that a class action

is superior to other available methods of adjudication."  *Id.*  The rule lists four nonexclusive

factors which go to the heart of this inquiry:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions; (B) the extent and
> nature of any litigation concerning the controversy already begun
> by or against class members; (C) the desirability or undesirability
> of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

*Id.* at 23(b)(3)(A)-(D).

In contrast to the "some showing" standard for collective certification under FLSA,

putative class representatives must show that the certification requirements are met by a

preponderance of the evidence.  *See Teamsters Local 445 Freight Div. Pension Fund v.*

*Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion

and hold that the preponderance of the evidence standard applies to evidence proffered to

establish Rule 23's requirements.").  When making the Rule 23 determination, district courts

must "assess all of the relevant evidence admitted at the class certification stage." *In re Initial Public Offerings Sec. Litig. [In re IPO]*, 471 F.3d 24, 42 (2d Cir. 2006). In sum,

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; [and] (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement . . . .

*Id.* at 41.

A plaintiff's pleadings are taken as true for the purposes of examining a class certification motion, *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir. 1978). However, it does well to note that the class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Thus, "[i]n order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotations omitted)). Rule 23's requirements accordingly act to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.*

### B.   Application of Rule 23(a) Factors

Plaintiffs propose a class of all ASMs who worked at DR and were not paid overtime premium compensation for all hours worked in excess of forty hours per workweek, at any time

between January 8, 2009 and the date of final judgment in the instant matter.  (Pl.'s Mem. at 2.)

In response, DR contends that, with respect to the Rule 23(a) factors, Plaintiffs cannot

adequately show commonality or typicality.

### 1.      Numerosity

Rule 23(a) first requires that "the class is so numerous that joinder of all members is

impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts generally presume numerosity where a class

consists of 40 or more members.  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d

Cir. 1995) (citing 1 *Newberg On Class Actions 2d* (1985 Ed.) § 3.05)).  Here, both Plaintiffs and

DR agree that there are currently nearly 750 current and former ASMs who have held the ASM

position since January 2009, and are members of the putative class in the instant action.  (*See*

Compl. at ¶ 38; Def.'s Opp. at 2-3.)  Accordingly, Plaintiffs have satisfied the numerosity

requirement.

### 2.      Commonality and Typicality

Commonality refers to the second Rule 23 prerequisite, which necessitates that "there are

questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality "requires that

the claims of the class representatives be typical of those of the class, and 'is satisfied when each

class member's claim arises from the same course of events, and each class member makes

similar legal arguments to prove the defendant's liability.'"  *Marisol*, 126 F.3d at 376 (quoting *In

re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir. 1992)).  These two requirements "tend

to merge into one another, so that similar considerations animate analysis of [both]."  *Id.*

With respect to commonality, the Supreme Court has clarified that, while "[a]ny

competently crafted class complaint literally raises common questions," *Dukes*, 131 S. Ct. at

2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84

7

N.Y.U.L. Rev. 97, 131–132 (2009) (internal quotations omitted)), mere recitation of "these

questions is *not* sufficient to . . . demonstrate that the class members 'have suffered the same

injury.'" *Id.* (quoting *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).

Put another way, even where employees of the same entity assert the same violation under a

single provision of law, only where their claims "depend on a common contention," which is

"capable of classwide resolution no less," will commonality in the Rule 23(a) sense be found to

exist. *Id.* Thus, examining commonality, a court looks to "the capacity of a classwide

proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

(quoting Nagareda, 84 N.Y.U.L. Rev. at 132) (internal quotations omitted). Despite the rigor of

the Rule 23 requirements, commonality has never been understood to require "that all issues

must be identical as to each member," but rather "require[s] that plaintiffs identify some unifying

thread among the members' claims that warrant[s] class treatment." *Damassia*, 250 F.R.D. at

156 (quotations and citation omitted).

Here, Plaintiffs assert several common questions, which include, *inter alia*:

> (a) whether Defendants have failed and/or refused to pay Plaintiffs
> and the Class overtime pay for hours worked in excess of 40 hours
> per workweek within the meaning [of NYLL]; (b) the nature and
> extent of class-wide injury and the appropriate measure of
> damages for the Class; (c) whether Defendants have a policy of
> misclassifying ASMs as exempt from coverage of the overtime
> provisions of the NYLL; and (d) whether Defendants' policy of
> misclassifying workers was done willfully and whether Defendants
> can prove that their unlawful policies were implemented in good
> faith.

(Pl.'s Mem. 16-17.) The question that is central to Plaintiffs' class certification inquiry involves

DR's alleged policy of misclassification. Defendants contend that "Plaintiffs fail to provide any

evidence that can answer the question of whether or not Plaintiffs were misclassified on a class-

wide basis," noting that "[i]t is only *individual* testimony that alleges that the Job Description is not accurate."  (Def.'s Opp. at 16 (emphasis added).)  Defendants also assert that nowhere do Plaintiffs identify a corporate policy or practice of DR that subsequently prevents ASMs from legitimately meeting the definition of an "exempt" employee under the NYLL.  (*Id.* at 16-17; 17 n. 36.)

    While Plaintiffs and DR disagree as to the extent of managerial aspects of ASMs' actual duties, and their related classification as exempt employees, Plaintiffs correctly assert that the merits of Plaintiffs' ultimate claims under FLSA and NYLL—meaning whether or not DR misclassified its employees—are largely beyond the scope of the class certification question. (*See* Reply Memorandum of Law in Support, Dkt. No. 102 ("Pl.'s Rep."), at 2 ("Plaintiffs and Duane Reade may disagree on how to characterize ASMs' job duties (exempt or nonexempt) and how to assess their relative importance (primary duties or not), but these are common questions proper for class treatment.").)  The merits can, and do, affect class certification, in the sense that merits questions and certification questions tend to overlap, but a premature inquiry into the merits should not serve as the *sine qua non* of a putative class's certification.  *See Brown v. Kelly,* 609 F.3d 467, 476 (2d Cir. 2010) ("In evaluating a motion for class certification, the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." (quoting *In re IPO*, 471 F.3d at 41)); *Cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).

    Instead, the commonality question before this Court at the class certification stage is whether the record evidence demonstrates a likelihood that common answers will be determined via a class action approach, or conversely, whether differences among ASMs will necessarily

generate individualized, rather than common, determinations as this litigation moves forward. Thus, the question is whether Plaintiffs have made a sufficient showing that whether DR misclassifies its ASMs is best litigated at the class level, rather than on the individual scale. Given the uniform classification of ASMs, the uniform description of ASMs' duties, the similarity among DR stores, and the discrete, geographical location of the DR brand, this Court concludes that Plaintiffs have sufficiently established commonality.

First, it is clear from the record that DR uniformly classifies all ASMs as exempt, without an individualized determination of each ASM's individual job. And, while Defendants are correct that a generalized, central policy is not alone determinative of class certification or commonality (Def.'s Opp. at 23), Plaintiffs are also correct that "[t]he uniform exemption classification . . . 'is certainly relevant to the court's decision and weighs in favor of class certification.'" (Pl.'s Rep. at 8) (quoting *Cuevas v. Citizens Fin. Grp., Inc.*, 283 F.R.D. 95, 99 (E.D.N.Y. 2012)); *accord Youngblood v. Family Dollar Stores, Inc.*, No. 09 Civ. 3176, 2011 WL 4597555, at *5 (S.D.N.Y. Oct. 4, 2011) ("'Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities.'" (quoting *Damassia*, 250 F.R.D. at 160-61)).

Defendants' contention that the dissimilarity of ASMs' duties defeats commonality is better suited to the predominance inquiry, discussed *infra*, together with an analysis of the Rule 23(b)(3) factors. *Cf. Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) ("With respect to the first category, Hertz's blanket exemption policy, we agree with the Ninth Circuit that while such a policy suggests 'the employer believes some degree of homogeneity exists among the

10

employees,' and is thus in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'") Put another way, to say there are common issues, sufficient to satisfy Rule 23(a)'s commonality requirement, is not to say that they necessarily predominate. Here, ASMs carry out their duties for DR pursuant to a uniform policy, uniform training, uniform job description, and uniform procedures set in place for each store—procedures that require adherence on the part of all ASMs who wish to maintain their job. (*See* Fuchs Decl., Exs. 56, 66.) As a class, they seek a determination as to whether their work so deviates from the description upon which their exempt classification is based to constitute a legitimate claim under NYLL—clearly a question that presents common factual issues that apply to all plaintiffs. To find that this question is not a common one would constitute an insurmountable bar for similar putative class plaintiffs to come. Thus, "[p]articularly in light of the 'liberal' construction of the commonality requirement of Rule 23," the Court finds the commonality requirement satisfied. *Damassia*, 250 F.R.D. at 157.

Additionally, as noted, commonality does not require plaintiffs to show that class members perform identical duties—an "impossible task." *White v. Western Beef Properties*, No. 07 Civ. 2345, 2011 WL 6140512, at *3 (E.D.N.Y. Dec. 9, 2011). Rather, the putative class members must have largely consistent duties, which lend themselves to common determinations. In contrast to *White*, a misclassification putative class action where deposition testimony of various company managers "span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery, Bakery, Deli, Dairy and Receiving—each of which has a distinct set of concerns and job duties," *id.* at *5, it appears that DR ASMs have similar baseline responsibilities from store to store, and that these general duties have not changed significantly since 2007. (*See* Brooks

Decl., Dkt. 103, Ex. PPP ("Baruch Tr."), at 15:11-18.)  Whether these baseline responsibilities require a degree of individualized proof that defeats the similarities of the common questions raised by Plaintiffs, again, is a question best suited for the predominance inquiry.  *Damassia*, 250 F.R.D. at 157 ("In spite of these common issues, Duane Reade argues that there are material differences in the duties of different assistant managers that make an individual examination of each position necessary.  But this argument does not refute the existence of common issues.  Rather, it argues that whatever common issues exist are overwhelmed by issues particular to individual class members.  As such, the argument is more appropriately addressed below in respect to the predominance requirement.").[1]

---

[1] In support of their position on Plaintiffs' alleged lack of commonality, Defendants highlight the Supreme Court's recent decision in *Dukes* as a standard-altering clarification requiring increased rigor in the commonality context of Rule 23(a) analysis.  (See Def.'s Opp. at 1-2.)  And while it is clear that *Dukes* emphasizes that a putative class must demonstrate a "common contention . . . that is capable of class wide resolution," meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Dukes*, 131 S. Ct. at 2551, the claims in *Dukes* are distinguishable from those at issue here.  For example, *Dukes* dealt with a proposed nationwide class of current and former female Wal-Mart employees alleging sex discrimination over pay and promotions.  *Id.* at 2547-48.  Since Wal-Mart's pay and promotion decisions were discretionarily effectuated at the local-manager level, *id.* at 2547, and given that Title VII in this context required "significant proof" that Wal-Mart "operated under a general policy of discrimination," *id.* at 2553, the Court held that the plaintiffs could not demonstrate sufficient commonality.  *See id.* at 2554 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal–Mart's 'policy' of allowing discretion by local supervisors over employment matters.  On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.  It is also a very common and presumptively reasonable way of doing business—one that we have said 'should itself raise no inference of discriminatory conduct[.]'" (emphasis in original) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988)).  Nothing in *Dukes* is inconsistent with this Court's conclusion with respect to commonality.  That case involved a nationwide class of women alleging disparate impact discrimination on the part of a corporate entity allowing massive discretion among its local managers; this case involves the 700 or so DR employees working in the particular position of ASM who are uniformly exempt from the overtime payment structure of the NYLL.

As for typicality, which requires that the named plaintiffs' claims be "typical of the claims . . . of the class," Fed. R. Civ. P. 23(a)(3), the "crux" of the inquiry "is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Marisol*, 126 F.3d at 376 (quoting *Falcon*, 457 U.S. at 157 n.13). As a general rule, typicality looks to whether the named plaintiffs' claims are sufficiently typical of those of the class to permit the fate of the putative class's claims to remain legally intertwined with those of the lead plaintiffs. *See Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11 Civ. 6546, 2013 WL 93636, at *5 (S.D.N.Y. Jan. 9, 2013) ("At bottom, the typicality requirement concerns the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims; thus, that representative's claims must be typical of the class so as to prevent a false prophet from bearing the standard for an entire class of claims."). Courts tend to interpret typicality as requiring that the class members' claims "arise[ ] from the same course of events," meaning "each class member [must] make[ ] similar legal arguments to prove the defendant's liability." *Marisol*, 126 F.3d at 376.

Here, Defendants posit that the inconsistencies between Jacobs' and Mars' testimony regarding their primary ASM duties are indicative of the atypicality of the lead plaintiffs' claims. (*See* Def.'s Opp. at 5-6, 17-18, 20.) For example, Defendants point out that Mars stated she did not supervise stock clerks (Fuchs Decl., Ex. 26, ("Mars Tr."), at 116:21-24),[2] whereas Jacob stated that he supervised "all employees working during [his] shift." (Fuchs Decl., Ex. 23

---

[2] Additional excerpts of Mars' deposition transcript are attached to one of the Declarations of Molly Brooks. (*See* Brooks Decl., Dkt. No. 93, Ex. O.)

("Jacob Tr."), at 270:11-15).[3]  However, Plaintiffs correctly point out that Jacobs added during this same testimony that despite his supervision, he ultimately had to "talk to the district manager or store manager."  (*Id.* at 270:16-271:17; *see also* Pl.'s Rep. at 3.)

Similarly, Defendants note that Mars characterized the store manager as the individual with ultimate responsibility for the "running of the store," even when she, as the ASM, was the only manager-level individual in the store.  (Mars Tr. at 95:12-19.)  In contrast, Jacobs responded in the affirmative when asked if he was responsible for occurrences within the store when he was the only manager present.  (Jacobs Tr. at 205:18-21.)  However, Jacobs also stated in his deposition that (1) his duties are the same when the store manager is present as they are in the absence of the store manager, *and* (2) store managers give instructions as to what ASMs should do in their absence, suggesting that the ultimate responsibility of "running the store" is similarly cabined by store manager fiat.  (Jacobs Tr. at 308:13-310:4.)

In terms of hiring and firing DR employees, Defendants highlight that Mars stated that ASMs did not have the power to terminate employees, nor did they recommend individuals to apply for employment (Mars Tr. at 118:14-22; 73:2-5), while Jacobs stated that he had recommended both the hiring and firing of certain individuals as an ASM.  (Jacobs Tr. at 116:10-24; 272:10-20.)  However, Jacobs later clarified that (1) recommending a candidate for a job constituted "referring the applicant to corporate headquarters" (Pl.'s Rep. at 3; Jacobs Tr. at 116:20-117:13); (2) he did not ever attend an interview of a candidate (Jacobs Tr. at 327:7-24); and (3) ultimate hiring decisions did not occur at the "store level."  (*Id.* at 311:6-12; 327:23-24.)  Moreover, while Jacobs did testify that he spoke with a loss prevention specialist regarding the

---

[3] Excerpts from the Jacob Transcript are also attached to the Declarations of Molly Brooks in Support of the Motion for Class certification.  (*See* Brooks Decl., Dkt. No. 93, Ex. JJ; Brooks Decl., Dkt. No. 103, Ex. RR.)

14

termination of one Alex (*id.* at 272:7-20), he later confirmed that the "[s]tore manager, assistant manager or a shift leader cannot fire [anybody] in the store.  Only the HR people can fire the people."  (*Id.* at 311:19-21.)

Defendants also note that, whereas Mars stated that she never dealt with her store's payroll or budget (Mars Tr. at 123:16-18), Jacob responded that he sometimes was asked by the store managers to work with the payroll budget.  (Jacob Tr. at 76:21-23.)  Jacobs later added that the "store budget is done by the district manager," who gives it to the store manager, meaning that ASMs do not "set" the store budget.  (*Id.* at 310:14-21.)

Finally, as for preparing work schedules, although Jacob stated that he had done so in one store (*id.* at 170:8-13), while Mars stated that in her experience the store manager was responsible for work schedules (Mars Tr. at 36:5-21), Jacobs also explained that even when he prepared work schedules in one store, those schedules were nevertheless overseen by his store manager.  (Jacob Tr. at 313:20-314:25.)

It is axiomatic that "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."  *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  While Defendants attempt to underscore the minor variations between Mars' and Jacobs' testimony to highlight the atypicality of their claims, it appears from the record that their accounts of the ASM duties are largely consistent with one another, and consistent with the majority of the other deposed ASMs' testimony.  Given that typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," *In re Drexel*, 960 F.2d at 291, Mars' and Jacobs' claims are sufficiently

15

"typical" of those asserted by other class members—namely that the duties they performed, which resemble those of each other, deviated significantly from the exempt description of the ASM position.

To reject Mars and Jacobs as class representatives on typicality grounds due to inconsequential variations in their testimony would be to do that which is expressly forbidden by this Circuit's precedent: to require that "all of the allegations of the class . . . fit together like pieces in a jigsaw puzzle." *Green v. Wolf Corp.*, 406 F.2d 291, 300 (2d Cir. 1968). Here, the particularities of these lead plaintiffs' circumstances do not "threaten" to become the "focus of the litigation" any more so than those of other members of the putative class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). Accordingly, the typicality requirement is satisfied.

### 3.      Adequacy

"Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. And second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel*, 960 F.2d at 291 (quoting *Eisen*, 391 F.2d at 562). Here, Defendants challenge neither the adequacy of the proposed class counsel, nor the putative lead plaintiffs. Moreover, there is no evidence in the record to suggest that any proposed class members have antagonistic interests. Additionally, Plaintiffs have amply demonstrated the ableness of their counsel. *See infra*, Sec. III.D.

16

### C.      Rule 23(b)(3) Factors

Having found that Plaintiffs have met Rule 23(a)'s requirements, the Court turns to Rule

23(b)(3).[4]  With respect to this so-called "predominance" requirement, DR argues that (1)

common questions do not predominate, as individualized analysis for each putative class

member is required; and (2) the class action is not a superior method of adjudicating Plaintiffs'

claims in this case.

#### 1.      Predominance of Common Questions

"The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation.'"  *Myers*, 624 F.3d at 547

(quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  This requirement can

be satisfied only "if resolution of some of the legal or factual questions that qualify each class

member's case as a genuine controversy can be achieved through generalized proof, and if these

particular issues are more substantial than the issues subject only to individualized proof."

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  In making the predominance

determination, a court must generally consider whether the proposed class can "establish each of

the . . . required elements of [their claims] using common evidence."  *In re Visa*

*Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), *overruled on other*

*grounds by In re IPO*, 471 F.3d 24.  In sum, "[w]hile a plaintiff need not show the 'exclusivity'

---

[4] Federal Rule of Civil Procedure 23(b) states in pertinent part:

> A class action may be maintained if Rule 23(a) is satisfied and if:
> . . . (3) the court finds that the questions of law or fact common to
> class members predominate over any questions affecting only
> individual members, and that a class action is superior to other
> available methods for fairly and efficiently adjudicating the
> controversy. . . .

Fed. R. Civ. P. 23(b)(3).

17

of common questions, it must show their predominance." *Weiner v. Snapple Beverage Corp.*,

No. 07 Civ. 8742, 2010 WL 3119452, at *5 (S.D.N.Y. Aug. 5, 2010).

Both parties agree that under NYLL, those employed in a "bona fide" executive or

administrative capacity are not entitled to premium overtime payment.[5]  However, the parties

present divergent accounts as to the predominance of common questions related to the

classification of DR ASMs as exempt employees.  On the one hand, Plaintiffs contend that in all

"ways material to the establishment of the [relevant] criteria," *Myers*, 624 F.3d at 549, ASMs'

duties are sufficiently uniform to permit a generalized inquiry into the appropriateness of their

---

[5] An employee works in a bona fide executive capacity if he or she is an employee
> (a) whose primary duty consists of the management of the enterprise in which such individual is employed or of a customarily recognized department or subdivision thereof; (b) who customarily and regularly directs the work of two or more other employees therein; (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; (d) who customarily and regularly exercise discretionary powers; and (e) who is paid for his services a salary of not less than [a specified amount].

12 N.Y.C.R.R. § 142-2.14(c)(4)(i).  By contrast, an employee is employed in a bona fide administrative capacity if he or she is one
> (a) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general operations of such individual's employer; (b) who customarily and regularly exercises discretion and independent judgment; (c) who regularly and directly assists an employer, or an employee employed in a bona fide executive or administrative capacity (*e.g.*, employment as an administrative assistant); or who performs, under only general supervision, work along specialized or technical lines requiring special training, experience or knowledge; and (d) who is paid for his services a salary of not less than [a specified amount].

12 N.Y.C.R.R. § 142-2.14(c)(4)(ii).

18

labor classification.  (Pl.'s Rep. at 5.)  On the other hand, Defendants assert that the voluminous

deposition testimony in this case underscores the "individualized and fact-intensive inquiry"

required to determine whether DR ASMs are misclassified on the whole as exempt employees.

(Def.'s Opp. at 18.)

DR notes that given the unique "nature of their position, ASMs may be required to

perform concurrent duties—both exempt and non-exempt—during the course of one day," while

nevertheless remaining exempt under the law, "even if they spend more than fifty percent of their

time performing non-exempt work."  (*Id.* (citing 29 C.F.R. § 541.700(c)); *see also* 29 C.F.R. §

541.106(b) ("An assistant manager can supervise employees and serve customers at the same

time without losing the exemption.  An exempt employee can also simultaneously direct the

work of other employees and stock shelves.").  These regulations, DR asserts, coupled with the

"striking differences in the alleged responsibilities and duties of the named Plaintiffs, opt-in

Plaintiffs, and Declarants," reinforce the conclusion that an individualized inquiry into each

ASM's actual duties constitutes the only way to ultimately determine whether a given employee

was properly classified as exempt.  (Def.'s Opp. at 19.)

The predominance inquiry in this context hinges on whether Plaintiffs have established,

by a preponderance of the evidence, that the primary duties of DR ASMs are sufficiently similar

to not only allow for generalized proof, as commonality demands, but also to outweigh those

issues "subject only to individualized proof."  *Moore*, 306 F.3d at 1252; *accord Damassia*, 250

F.R.D. at 159 ("[The predominance inquiry] is 'more demanding' than the commonality inquiry

under Rule 23(a), because it requires not only that there be disputed issues that can be resolved

through 'generalized proof,' but also that 'these particular issues are more substantial than the

issues subject only to individualized proof.'" (quoting *Moore*, 306 F.3d at 1252)).  Indeed, there

19

are elements of the ASM position that vary from store to store, and still others that require varying degrees of individualized proof.  However, such distinctions do not defeat predominance unless they overshadow those common threads that bind the claims of a putative class.

### a.    Primary Duties

Here, the weight of the evidence tends to show that all ASMs share similar primary job responsibilities, and also have a similar understanding of their role in the DR organization—a conclusion warranted from consistent threads among myriad ASM deposition testimony.

For example, deposed ASMs described their jobs as a mix of a similar set of duties, including working the cash register, assisting customers, stocking shelves, arranging products in concert with the Plan-O-Gram, ensuring that the store was clean, packing out the store or trucks, and handling money.  (*See, e.g.*, Brooks Decl., Dkt. No. 103, Ex. WW ("Lewis Tr."), at 99:5-101:3; 99:11-16 (describing ASM duties as a mix of stocking shelves, customer service, and "cashiering"); *id.*, Ex. XX ("Gerald Tr."), at 72:15-24 (noting that as an ASM he was responsible for "prepping the store" and merchandising);  *id.*, Ex. ZZ ("Mendez Tr."), at 232:4-18 (agreeing that as an ASM 70 percent of his time was spent on manual labor, working the cash register, assisting customers, acting as a stock clerk, and cashiering); *id.*, Ex. AAA ("Saddik Tr."), at 275:10-277:14 (describing his primary job duties as stocking shelves, working the register, moving products around to match the Plan-O-Gram sent by corporate, cleaning store, unloading trucks, taking out the garbage, and engaging in office work); *id.*, Ex. BBB ("Ifill Tr."), at 169:4-11 (noting that as an ASM, 80 percent of his time was spent on the floor dealing with the store and the rest of his time was in the office); *id.*, Ex. CCC ("Wash. Tr."), at 124:9-125:1; 164:14-165:5 (describing the majority of his day as spent on the floor, helping customers); Fuchs Decl., Ex. 11 ("Demarco Tr."), at 87:25-88:7 (describing the ASM job as primarily engaged in

20

customer service, money handling, recovering the store, packing out the store, packing out the trucks, maintenance of the store, maintenance of the Plan-O-Grams, and organizing sales items on the sales floors); *id.*, Ex. 12 ("Diop Tr."), at 173:24-174:10 (describing his primary duty as managing the store and making sure there were no issues with customers).)

DR asserts that some ASMs have more of a supervisory role than others and are materially involved in scheduling and supervision of employees.  (Def.'s Opp. at 6-7.)  However, from the vast majority of the testimony, it appears that most ASMs feel generally responsible for the management of the store, but recognize that the SM or district manager (DM) has the final word on terminations, hires, and the schedule.  Moreover, ASMs generally noted across the board that they served as the primary manager on site, and performed duties usually exclusive to the SM, only sporadically when the SM was away on vacation, or indisposed.  (*See* Demarco Tr., at 87:4-7 (stating that as an ASM more initiative was required when the SM was not there); Jacob Tr., at 270:11-15 (noting that while he supervised employees during his shift, he "still had to talk to the district manager"); Saddik Tr., at 118:14-119:3 (explaining that he took care of the store for a week when the SM was on vacation); Wash Tr., at 22:1-25 (stating that she has prepared the schedule for her new SM on a few occasions when the SM was unable to do so); Fuchs Decl., Ex. 6 ("Bharat Tr."), at 262:15-21 (stating that when the ASM is the only one on duty, he is "responsible"); *id.*, Ex. 15 ("Faruk Tr."), at 41:2-8 (noting that when the SM is not in the store, the ASM is responsible); *id.*, Ex. 27 ("Mehta Tr."), at 62:8-23 (describing that changing the schedule without manager approval was not generally permitted, except in case of emergency); *id.*, Ex. 17 ("Forde Tr."), at 168:9-24 (noting that ASMs are in sole charge when the SMs are away, but stating that there was always contact with the manager when the manager was on vacation).)

At bottom, the deposition testimony reflects that most ASMs perform similar day-to-day functions.  Moreover, it reveals that they all generally feel responsible for keeping the stores up to "standards."  (Ifill Tr., at 38:7-39:4; *accord* Fuchs Decl., Ex. 18 ("Gaynor Tr."), at 159:2-4 (describing the ASMs' primary duty as making sure the store is "running properly").) Additionally, the depositions reflect that all ASMs have experienced that their duties are cabined somewhat by the ultimate direction of the SM or human resources—no matter whether they pass on information related to hiring or terminations, or not, and no matter whether they claim to spend the majority of their time in the office, rather than on the floor, or not.  (*See, e.g.*, *id.*, Ex. 37 ("Babington Decl."), at ¶ 24 (noting that as an ASM she covers the store when the SM is away); *id.*, Ex. 41 ("Clarke Decl."), at ¶ 13 (stating that ASMs "cover" the store when the SMs are not present or on vacation; *see also* Gerald Tr., at 165:4-166:18 (noting that ASMs forward reports on employees to human resources and do not have the final say with respect to termination); Brooks Decl., Dkt. No. 103, Ex. QQQ ("Howland Tr."), at 78:1-79:24 (explaining that the SM, not the ASM would run applicant interviews); *id.*, Ex. SSS ("Saleem Tr."), at 87:5-21 (noting that she only performed weekly schedules when the SM requested she do so); Wash. Tr., at 89:6-90:9 (confirming that SMs, not ASMs, had the final responsibility for store hiring).)

DR also highlights apparent discrepancies among various ASMs' testimony, arguing that duties vary so significantly from ASM to ASM that the "core" merits inquiry associated with the executive and administrative exemptions is necessarily an individualized one.  (Def.'s Opp. at 7.) This Court disagrees.  While the ASM experience certainly varies at the margins, it appears from the deposition testimony, together with the non-cross-examined declarations offered by DR— that most, if not all, ASMs perform a similar swath of duties, ranging from customer service to office work.  It is true that some ASMs perform tasks that others may never do.  (*See* Brooks

Decl., Dkt. No. 103, Ex. UU ("Allen Tr."), at 113:8-115:9 (explaining that he did more manual labor than his fellow ASM "Zaman," as Zaman was older and was better at cashiering or handling money, whereas Allen and other ASMs focused more on packing out or stocking).) However, these minor deviations do not eliminate the overriding consistencies present throughout all the testimony—consistencies that bolster the Court's determination that ASMs have similar primary responsibilities.  (*See* Gaynor Tr., at 159:2-4 ("I think my responsibilities are the same for any manager on duty, meaning that the store is running properly.")).

Moreover, while Defendants' declarations emphasize the alleged managerial and supervisory aspects of ASMs' roles, suggesting that some ASMs perform close to zero non-managerial or supervisory work (*see generally* Fuchs Decl., Exs. 37-54), "there is nothing in the deposition testimony to support the extreme discontinuity in the roles of different assistant managers that a literal reading of the declarations would suggest."  *Damassia*, 250 F.R.D. at 160. Instead, "the deposition testimony suggests that while assistant managers regularly spend significant parts of their shifts performing manual labor activities like sweeping and mopping the store, they are at the same time responsible for directing the work of other store personnel engaged in similar tasks."  *Id.*

### b.    Differences Among Stores

DR also contends that individual issues predominate, given the extreme variations between DR stores within the metropolitan area, including the shift to "New Look" stores, which have fresh food departments, pharmacies, and makeup boutiques.  (Def.'s Opp. 12-13.)  The declarations of current ASMs submitted by DR state—in nearly identical language—that ASM duties vary by store, as some stores are bigger than others, some stores are "New Look," and every SM has a different management style, which in turn affects the duties of the ASMs under

23

their purview.  (*See generally* Fuchs Decl., Exs. 37-53.)  However, the weight of the evidence

does not support these conclusions, nor are SMs' varying managerial styles dispositive here.

First, while some SMs undoubtedly give their ASMs more responsibility than others,

there is no record evidence to suggest that SMs' discretion fundamentally changes the primary

duties of a DR ASM.  A management style is just that—a style—and given DR's uniform ASM

job description and consistent approach to training ASMs, it is unpersuasive that a given SM in

an individual store could single-handedly abrogate various aspects of the ASM role.  To be sure,

duties are likely apportioned slightly differently based on the management of an individual DR,

but again, "[i]t is not possible (or necessary) at this stage to decide precisely how the mix of

responsibilities is apportioned . . . ."  *Damassia*, 250 F.R.D. at 160.  Moreover, regardless, it

"appears from the depositions [that responsibilities are] largely consistent across assistant

managers," emphasizing the predominance of common, rather than individual issues of fact and

proof.  *Id.*; *accord Youngblood*, 2011 WL 4597555, at *5 (noting that the differences among

employees did not preclude class certification, "particularly in view of the comprehensive

written Family Dollar policy manuals and the testimony of Family Dollar's designated corporate

executive that all store managers 'are responsible for getting recovery done' and for 'managing

... the assets that are in the store,' and that their 'primary dut[y]' is '[t]o run a profitable store'").

Additionally, DR contends that the introduction of the "New Look" remodeled store has

substantially changed ASMs' duties, "provid[ing] a host of new duties and responsibilities."

(Def.'s Opp. at 12.)  However, this contention—while weakly supported by the DR declarations

that state that store size and type alters ASMs' responsibilities—is undermined by the deposition

testimony, which suggests, as Plaintiffs point out, that the "New Look" stores alter ASM duties

only "marginally."  (Pl.'s Rep. at 10; *accord* Gerald Tr., at 93:24-94:4 (noting that fresh food

24

upkeep and date-checking on dairy were the only major changes in duties in the "New Look"

stores); Howland Tr., at 51:6-8 (stating remodeling of stores and the new Boutique did not create

additional ASM work); Ifill Tr., at 115:17-20 (describing the "Look Boutique" as a "separate

entity" from the DR store, with its own staff); *id.* at 114:24-115:16 (maintaining fresh food and

closing the store versus having it open 24 hours a day were the only noticeable differences

between the old stores and the revamped DR stores); Jacob Tr., at 198:19-199:6 (describing the

new stores' layout as different from previous stores, but the ASM duties as largely the same);

Wash Tr., at 166:22-167:9 (noting that ASMs do not have responsibility for the "Look

Boutique"); *id.* at 167:18-22 (stating that there is no major difference between the new stores and

the old stores).)

Furthermore, the deposition testimony confirms that DR's overarching training of,

policies regarding, and approach toward ASMs do not vary based on store size or type.  (*See,

e.g.*, Gerald Tr., at 170:20-171:7 (noting that ASM tasks are always the same or similar, the tasks

do not vary from store to store, and ASMs receive no new training when transferred to a new

store); Wash. Tr., at 164:14-165:5 (stating that there is no ASM training based on lateral moves

from store to store).)

### c.     ASM Position Overhaul

DR also contends that the entire ASM position has been overhauled since Judge Lynch

certified a class of DR ASMs in *Damassia*—a nearly identical case—several years ago.  DR

contends that the "profound changes to Duane Reade's store operations and management and the

relevant tasks required to be performed by ASMs since *Damassia*" reveal that class certification

in the instant case is "inappropriate."  (Def.'s Opp. at 9.)  It appears, however, that this overhaul,

regardless of its intrinsic value or purpose, has not significantly increased the variance among

ASMs' duties.  As Plaintiffs correctly point out, DR's "class-wide training on managerial topics

did not change ASMs' duties," nor did it make them more distinct from each others'

responsibilities.  (Pl.'s Rep. at 10.)  In fact, Francine Baruch, formerly a director of training and

development for DR, testified that ASM duties have primarily remained the same since 2007.

(Baruch Tr., at 15:5-18; *accord* Mendez Tr., at 232:4-18 (confirming that his ASM duties have

remained consistent throughout his time as an ASM).)

The distinctions that DR highlights are variations at the margins of what appears, from

the record, to be a largely consistent employment position.  For example, while DR asserts that

the creation of a new "shift leader" position decreased the number of ASMs assigned to the

nightshifts, the record reflects overall consistency in ASM duties, regardless of whether or not

the ASM is working a daytime or evening shift.  (*See, e.g.*, Brooks Decl., Dkt. No. 103, Ex. YY

("Echevarria Tr."), at 30:4-7.)  In any event, the shift leader position has not appeared to alter the

duties of the ASM, but rather dovetails with the ASM position, including many of the same

duties as the ASM.  (*See* Gerald Tr., at 171:8-23 (noting that shift leaders and ASMs perform

many similar tasks, though the ASMs have access to an employee authenticator, while shift

leaders do not); Howland Tr., at 157:11-19 (stating shift leaders and ASMs perform many of the

same tasks); Wash. Tr., at 166:5-9 (noting the similarities between the shift leader and ASM

positions).)

It is of course not yet evident whether ASMs are properly classified as exempt employees

under the NYLL.  However, the record thus far reflects that their duties—whether legitimately

managerial in nature or not—are largely consistent across stores and individuals.  Predominance

requires meaningful consistency, not indistinguishable identity.  Accordingly, this Court finds

that common, rather than individual, issues predominate in this case.

26

### 2.    Superior Method

In addition to predominance, Rule 23(b)(3) requires that plaintiffs show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In examining superiority, Rule 23 directs courts to consider four, non-exhaustive, factors.[6]  DR contends that under *Dukes*, a class wide determination of liability is impossible, citing the Rules Enabling Act, which forbids a court from wielding Rule 23 in order to "abridge, enlarge or modify any substantive right."  (Def.'s Opp. at 25 (quoting *Dukes*, 131 S. Ct. at 2561 and 28 U.S.C. § 2072(b)).)  While DR contends that Plaintiffs conclusorily allege the superiority of class litigation, this Court disagrees.  Plaintiffs plead the presence of the factors, and in light of the record, and this Court's finding with respect to predominance, class determination is superior to individualized litigation.

First, for most members of the putative class, pursuing this litigation individually would be a hindrance rather than a boon.  As Plaintiffs point out, "a class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses."  *Han v. Sterling Nat.'l Morg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *11 (E.D.N.Y. Sept. 14, 2011).  For a single, potentially misclassified ASM, the impetus to sue an employer for what might constitute a small economic return is minimal.  The alleged misclassification here applies to an entire class of employees' duties, rather than an individual, case-by-case determination.  Additionally, the burden and expense of individual litigation would likely be prohibitive for most ASM plaintiffs.  (*See* Pl.'s Mem. at 23.)

---

[6] For a list of these factors *see supra*, Sec. III.A., at 5.

Second, this Court is not aware of any current litigation concerning this controversy. And third, the Southern District of New York is an appropriate forum given that "Duane Reade's headquarters are in this District and the class members work and/or reside []here." (*Id.*) Last, this class is manageable. It constitutes fewer than 1,000 putative members, and it is concentrated in a single, geographic area, rather than spanning the nation. As discussed above, ASMs' duties are more alike than they are dissimilar, and as such, lend themselves to determination as a class. Accordingly, the class action is the superior method of determining the result in the instant case.

### D.    Class Counsel

Finally, Plaintiffs request that the Court appoint Outten & Golden, LLP ("O&G"), Klafter Olsen & Lesser ("KO&L"), and Gottlieb & Associates ("G&A") as class counsel going forward. (*Id.* at 24.) The appointment of class counsel is governed by Rule 23(g) of the Federal Rules of Civil Procedure, which mandates that a court certifying a class appoint class counsel, and specifies that a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class . . . .

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Moreover, a court *may* also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* at 23(1)(B).

Thus far, the work Plaintiffs' counsel has performed has involved voluminous discovery and difficult questions of both law and fact. Counsel have shown themselves to be vigorous representatives of the putative class. Moreover, all counsel have experience in handling class

actions, sufficient knowledge of the pertinent law, and sufficient resources to commit to this

representation.  *See, e.g.*, *Dorn v. Eddington Sec., Inc.*, No. 08 Civ. 10271, 2011 WL 382200, at

*3 (S.D.N.Y. Jan 21, 2011) ("O & G has extensive experience prosecuting and settling

nationwide wage and hour class and collective actions and are well-versed in wage and hour and

class action law."); *Damassia v. Duane Reade, Inc.*, 2009 WL 5841128, at *4 (S.D.N.Y. Jul. 27,

2009) ("On May 27, 2008, the Court appointed Adam T. Klein, Justin M. Swartz, and Linda A.

Neilan of Outten & Golden LLP and Seth Lesser and Fran Rudich of Klafter Olsen & Lesser

LLP (previously of Locks Law Firm PLLC) as Class Counsel because they met all of the

requirements of Fed.R.Civ.P. 23(g).").  Therefore, Plaintiffs' counsel are appointed as class

counsel.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED and

counsel for Plaintiffs are hereby appointed as class counsel.

The Clerk of Court is directed to close the motion at docket entry number 91.


SO ORDERED.

Dated:  New York, New York
        March 20, 2013

_____
J. PAUL OETKEN
United States District Judge