d799jaca

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MANI JACOB, ET AL.,

4               Plaintiffs,

5         v.                          11 CV 160 (JPO)

6   DUANE READE, INC., ET AL.,

7               Defendants.

8   ------------------------------x
                                     New York, N.Y.
9                                    July 9, 2013
                                     11:10 a.m.
10
    Before:
11
                      HON. J. PAUL OETKEN
12
                                          District Judge
13
                          APPEARANCES
14
    OUTTEN & GOLDEN, LLP
15        Attorneys for Plaintiffs
    BY:  ADAM T. KLEIN
16         MOLLY ANNE BROOKS

17  KLAFTER, OLSEN & LESSER, LLP
          Attorneys for Plaintiffs
18  BY:  FRAN L. RUDICH

19

20  LITTLER MENDELSON, P.C.
          Attorneys for Defendants
    BY:  CRAIG R. BENSON
21         STEPHEN A. FUCHS

22

23

24

25

d799jaca

```
 1              (In open court; case called)
 2              THE COURT:  Good morning everyone.
 3              We're starting with the Jacob against Duane Reade
 4    case.  And I believe I had actually scheduled oral argument in
 5    both this case and the Right Aid case because there are some
 6    overlapping similar issues.  I'm not clear exactly to what
 7    extent they will be decided on the same issues or not, but I
 8    thought it was helpful to do them essentially back-to-back.
 9              So we'll start with the Jacob case.  And what's before
10    me is a motion for reconsideration of my class certification
11    ruling in the case which relates to assistant store managers at
12    the Duane Reade stores.
13              So I'll hear first from the movant, Mr. Benson.
14              MR. BENSON:  Yes, your Honor.
15              THE COURT:  And what I'd like you to -- I mean you can
16    cover whatever you'd like.  What I'd like you to focus on I
17    guess is the issue of -- well, what you raise in the motion
18    primarily is the issue of Comcast, the Comcast decision.  And
19    whatever points you'd like to emphasize about that.
20              The question I have in my mind is -- and this is
21    something that presumably is being worked out in certainly
22    district courts and maybe to some extent courts of appeals --
23    is to what extent does the Comcast decision represent a ruling,
24    first of all, that applies outside the antitrust context and
25    then beyond that, is it a ruling that -- that damages, if
```

d799jaca

they're not capable of measurement on a class-wide basis,

automatically in every -- and every case that is sought to be

certified under Rule 23 necessarily fails the predominance

inquiry going forward.

So I want you to focus on those issues and then any

other issues that you focused on for reconsideration.

MR. BENSON:  Okay.  Would you like me to stay at

counsel table or the lecturn?

THE COURT:  Whatever you're more comfortable with, as

long as the court reporter can hear you.  At counsel table is

fine.

MR. BENSON:  I have a very loud voice.  You won't have

a problem hearing me.

Good morning and appreciate the opportunity to orally

argue before you.  We do recognize that this is a motion for

reconsideration.  And while it should come as no surprise that

we respectfully disagreed with your Honor's decision, we

understand that this is not a situation where we can just ask

you to change a decision for no other reason than we disagree.

We made this motion because we believe that since that decision

the law has been clarified in two separate but equally

important ways, one of which involves Comcast, as I'll get

into, and another involves the Supreme Court's decision in

Dukes.  And the principles set forth in that important

decision, it is now clear, do in fact apply in the wage-an-hour

d799jaca

1    context.

2             And secondly, as I said, in the Comcast decision, the

3    Supreme Court clarified the applicable standard to be utilized

4    in the 23(b)(3) predominance analysis.  Specifically, it

5    established that an analysis of the damages model, whether

6    individual damages calculations are necessary is a crucial

7    factor in the analysis.

8             Taken together, we believe that these decisions and

9    several decisions that have been issued since establish that a

10   changed landscape, a landscape where class action treatment is

11   only appropriate in the limited situations where there exists

12   common types of proof and damage calculations that do not

13   require individual assessments.

14            And it is clear that this case does not fall into that

15   limited category.

16            THE COURT:  Would there be any wage-an-hour cases that

17   would survive under that analysis?  In the end, don't they

18   essentially all require individualized analysis, even if

19   there's a single method of calculation?  Or don't they all

20   involve individual analyses insofar as the individual employees

21   would have worked different hours day by day?

22            MR. BENSON:  In the end of the day, it's more a

23   fairness and a due process issue.  And there are many

24   situations where damage calculations could be objectively

25   ascertained.  For example, if a company doesn't pay spread of

d799jaca

1    hours under New York law which requires an additional hour of

2    pay after ten hours and they just didn't do it and you could

3    ascertain who worked ten hours, who worked more than ten hours

4    and just apply a damage calculation.

5            But the difference here -- and in certain types of

6    wage-an-hour cases, the difference here is that there are two

7    very important components of the damages here that do, in fact,

8    require that individual analysis and specifically would deprive

9    Duane Reade in this case of its right to defend itself with

10   respect to that.  And that's because here the measure of

11   damages is in the number of hours that each individual --

12   assuming that they were successful on liability, the number of

13   hours that each individual worked on a daily basis and then a

14   weekly basis to determine whether, in fact, that they worked

15   over 40 and would be eligible for any overtime.

16           And then more importantly -- because again -- and

17   there is no way around looking at each individual, determining

18   what the proofs are with respect to that individual, did they

19   work over 40 and how many hours over 40 every week for the

20   entire period for each individual.  There is no way around

21   doing that analysis.  Otherwise, you're going to deprive Duane

22   Reade of its right.  Because -- and this is also important.

23   There is no way -- there is no common aspect.  In other words,

24   all assistant store managers don't work the same number of

25   hours every week.  If, for example, they did, then it would be

d799jaca

1   easier, but they don't.  And there's no proof that they do.

2            In fact, if you look at the footnote in the reply

3   papers of plaintiff, they list an exhaustive list of

4   differences -- I believe it's footnote 4 -- no, it's not.  Just

5   bear with me one second, your Honor.  Because I think this is

6   important.

7            It's footnote six.

8            THE COURT:  Of the opposition.

9            MR. BENSON:  Of the opposition.

10           I'm sorry.  I think it's -- isn't it footnote --

11           MR. FUCHS:  It's their footnote six of their

12   opposition.

13           THE COURT:  Yes.  It's the very long footnote.

14           MR. BENSON:  So we counter.  And there are 27

15   iterations, even in that footnote, of different hours that

16   supposedly were worked by -- taking the plaintiffs' deposition

17   testimony.

18           THE COURT:  No, clearly there are different hours.

19           MR. BENSON:  Different hours.

20           THE COURT:  My question is:  Is there a system by

21   which each of them kept track of when they came in and when

22   they left?

23           MR. BENSON:  There were time -- there were punched

24   time records.

25           THE COURT:  So for every employee there's time

d799jaca

1    records.

2          MR. BENSON:  Not every employee.  But for the -- there

3    should be time records for, in most cases.

4          But even time records aren't necessarily accurate.

5    There was a decision that the Seventh Circuit just issued in

6    this case.  Farmer v. DirectSat.  I don't have any Westlaw

7    site.  It's 08 CV 3962.  Where even in that case the Seventh

8    Circuit determined that when you're talking about trying to

9    determine the number of hours, and that case was off-the-clock,

10   that even looking at a time clock isn't necessarily reliable

11   because it doesn't mean that they were working during all those

12   hours.  They could have been not working for a half-hour or a

13   certain amount of time.

14         THE COURT:  But here's my question.  Assume that there

15   were an accurate method, doesn't that meet what the Supreme

16   Court was talking about when they said having sort of a single

17   method of calculating damages?

18         MR. BENSON:  Well, again, it's going to be ultimately

19   a matter of degree.  And where I -- as I said, there's

20   completely objective, easily ascertainable proof, I would say

21   yes, you wouldn't necessarily need individual testimony.  But

22   it's the second component of the damages analysis where, again,

23   there is no way around that here, and that is with respect to

24   what type of relief they would be entitled to, whether it's

25   half-time, whether it's time-and-a-half.  The issue of what was

d799jaca

1    the arrangement between Duane Reade and each individual

2    manager.

3            And there is varying testimony.  The law is clear that

4    if it was the intent of the parties that their salary covered

5    all hours that they worked -- and that's our position -- if it

6    was the intent of the parties, then each week you divide the

7    number of hours that they worked into their salary.  You get a

8    rate and then they're entitled to half-time.

9            Plaintiffs don't take that position at all.  They take

10   the position to the contrary.  They claim that they're entitled

11   to time-and-a-half after 40 hours.

12           There's also a third possible position here.  And that

13   is that there was some expectation that the salary covered X

14   number of hours, for example, 55 or 60, and that you'd be

15   entitled to half-time for those number of hours.  And then an

16   additional time-and-a-half beyond that.

17           THE COURT:  Isn't there some dispute as to whether the

18   whole fluctuating work week method applies in misclassification

19   cases?

20           MR. BENSON:  There is no dispute.  It's ultimately a

21   question of fact on an individual basis as to what the

22   arrangement is.  There is no way to ascertain on a class-wide

23   basis -- unless plaintiffs were adopting the position that it

24   was clear and undisputed that all plaintiffs were compensated

25   on the fluctuant work week method and that that was understood,

d799jaca

1   you would not need an individual issue.  You know you have to

2   do an individual analysis.  There is no way around that.

3           And we know from the deposition testimony that, the

4   testimony, the proof in the record is widely varied with

5   respect to the individuals who were questioned about this.

6   Some said after 40 hours I expected overtime.  Some said 55

7   hours.  Some said all hours worked.  It's all over the lot.

8           THE COURT:  And they had different arrangements -- I

9   assume they didn't have employment contracts, they had various

10  oral arrangements or --

11          MR. BENSON:  Well, it varied.  In some cases there are

12  written statements where they acknowledge that it's for all

13  hours worked.  Even in those situations their testimony was:  I

14  signed that but I didn't know what it was.  I was forced to.  I

15  didn't read it.  I was told I had no choice.

16          So -- but that's not all the cases.  That's not

17  everybody.  Some have signed.  Some haven't.

18          The point is it's different for everybody.  And this

19  is a big deal.  This is a difference of potentially 300 percent

20  on an individual-by-individual basis when it comes to

21  ultimately what damages are appropriate.

22          And this is exactly the type of situation that the

23  Court said we need to look at and determine whether or not,

24  that if we certify a class, we'll have to do that.

25          And, again, if Comcast applies -- and we think it

d799jaca

1    clearly does -- there is no way around the determination that

2    ultimately in this case in order for Duane Reade to be given

3    its due rights, we need the ability to assess on an

4    individual-by-individual basis what that was.

5           If they say that the arrangement was different from

6    either what they signed or what we believe the arrangement is,

7    we should be entitled to test that.

8           And that can't be done on a class-wide basis.

9           THE COURT:  What's the status of discovery?  Has there

10   been only class discovery -- class cert discovery in this case

11   or has there been general liability discovery?

12          MR. BENSON:  Basically only at this point class-wide

13   discovery.  There has been no real -- although we have as part

14   of that in certain cases inquired into, you know, for example,

15   on the issue of what was the intention of the parties with

16   respect to the fluctuating work week issue.  The limited number

17   of individuals who have been deposed have provided testimony

18   with respect to that very important point.  That's why we're

19   able to make it, because the results were so varying and

20   different.

21          THE COURT:  Okay.  Thank you.

22          Is there anything else?

23          MR. BENSON:  I'll reserve.

24          THE COURT:  Mr. Klein.

25          MR. KLEIN:  Good morning, your Honor.

d799jaca

1              Let me just address a couple points and I will try to

2      be brief.

3              In the Comcast decision itself, Justice Ginsburg in

4      the dissent states that the opinion, Comcast opinion breaks no

5      new ground on the standard for certifying class action on Rule

6      23(b)(3).  She writes in particular, "The decision should not

7      be read to require as a prerequisite to certification that

8      damages attributable to a class-wide injury be measurable on a

9      class-wide basis."

10             That's further afield than what we have in this case.

11     In this case, we have an employer who has a statutory

12     obligation to maintain accurate and reliable time records of

13     hours worked and payments received for each work week for each

14     employee.

15             They claim, on one hand, that they have records.  But

16     on the other hand say that we're not sure they're reliable.

17             THE COURT:  Do they have an obligation to maintain

18     them if they're exempt?

19             MR. KLEIN:  Well, that's the issue.  If they're

20     misclassified if, in fact, they were nonexempt --

21             THE COURT:  But if they were, in fact, exempt, then

22     there is no obligation?

23             MR. KLEIN:  That is true.

24             But the record keeping requirements are very explicit

25     on that.

d799jaca

1          THE COURT:  But they apply to people who turn out to

2    be nonexempt?

3          MR. KLEIN:  That's right.  Yes.

4          In other words, if the employees are determined to

5    have an entitlement to overtime, then the employer had a

6    concomitant duty to maintain accurate time records under both

7    the Fair Labor Standards Act and New York labor law.

8          The other point is that this question of Comcast and

9    the implication or impact, your original question to Mr. Benson

10   in the wage-an-hour context is quite clear.  We cite to a case

11   on the Ninth Circuit that just came down, Leyva v. Medline.

12   And in Leyva, the Ninth Circuit explains quite clearly why

13   Comcast would not apply when the question in the case relates

14   to whether individualized damages would defeat Rule 23(b)(3)

15   predominance or superiority.  In the Ninth Circuit's decision

16   in Medline, they basically explain what Justice Ginsburg said

17   in her dissent in Comcast, that there's really no application

18   of the Comcast decision which related to trying to tie a

19   particular theory of causation to the economic harm of the

20   class distinct from a case where, as a consequence of a

21   misclassification decision or decision on liability, damages

22   automatically flow and the only question is what does each

23   individual class member receive.

24          THE COURT:  But in the Leyva case, L-E-Y-V-A

25   Medline --

d799jaca

```
 1            MR. KLEIN:  Right.

 2            THE COURT:  The Court says that the plaintiffs could

 3   present a "computerized payroll and timekeeping database."

 4            Does that exist here?

 5            MR. KLEIN:  It does.  Mr. Benson says, and we agree,

 6   that there are punch records.  We could supplement those

 7   records with additional testimony from class members.  There's

 8   a plethora of evidence that's available.  We haven't discovered

 9   that yet.  That isn't part of the first stage liability

10   determination.  That's certainly one of the options.

11            Another option is a special master.  Individualized

12   issues may arise or not.  We're not sure.

13            The irony, of course, your Honor, is the defendant on

14   the one hand says they didn't misclassify assistant store

15   managers, meaning we never get to the damages phase of this

16   case; but on the other hand say we can't certify class because

17   there are individualized issues relating to damages.  It's one

18   or the other.  They can't argue both points simultaneously.

19   And that's essentially what they're trying to do here.

20            Just to your point before, your Honor.  This is an

21   issue that comes up in every single last wage-an-hour case,

22   what each individual class member is entitled to in terms of

23   hours worked.  And it would just essentially put this area of

24   practice on its ear if the Comcast decision means not

25   certifying a class because there are individualized differences
```

d799jaca

1    in terms of damages in a case where the employer had the

2    obligation to maintain accurate records.

3          THE COURT:  The one thing I'll ask you about that is

4    it does seem -- it would be surprising, I would think, if the

5    Supreme Court in an antitrust decision wrote something about

6    Rule 23 that's so broad that it would effectively eliminate all

7    wage-an-hour class-wide litigation.  But at the same time

8    Justice Scalia says in response to Ginsburg's dissent, you

9    know, I don't know why the dissent is talking about antitrust

10   law.  This is a straightforward case about Rule 23.  And then

11   he says respondent's model falls short of establishing that

12   damages are capable of measurement on a class-wide basis.  And

13   if that means there has to be kind of one unitary overarching

14   way of measuring damages, then maybe that's what they did.

15         MR. KLEIN:  So on that point, your Honor, this is a

16   critical distinction between antitrust and every other area of

17   law, particularly wage an hour.  In antitrust and in Comcast in

18   particular, the plaintiffs asserted that there were four

19   different theories of causation and that the expert could not

20   identify the amount of damages attributable to the accepted

21   theory of causation.  They didn't know and couldn't have known

22   or come up with a damages model.

23         It isn't a question of individualized differences.

24   It's a question of:  Is the class or any part of the class

25   entitled to a dollar, a million dollars, or a hundred million

d799jaca

```
 1   dollars?  They couldn't answer that question.  That's a far cry
 2   from a case where it's obvious that there's a causal
 3   relationship between misclassification and liability grounds
 4   and entitlement to damages.  The only issue remaining in a case
 5   like this is well so worker A gets five thousand dollars and
 6   worker B gets six thousand dollars.  That's a different
 7   question.
 8            THE COURT:  Let me just ask another question about,
 9   which I asked Mr. Benson.
10            The discovery that's happened in this case so far has
11   essentially been class discovery?  It hasn't been liability
12   discovery?
13            MR. KLEIN:  Essentially liability discovery.  We have
14   not done individualized or damages phase discovery.
15            THE COURT:  Okay.  What about the idea of
16   bifurcating -- I think there are a couple of district courts
17   out there that have addressed this Comcast issue by saying --
18   they've done it a couple of different ways.  One is the Ninth
19   Circuit's approach.  But it seems like there are one or two
20   that have said well we can bifurcate, you know, liability is
21   different from damages; and if there's an issue under Comcast,
22   it would only affect the damages inquiry.  What do you think of
23   that idea of a bifurcation?
24            MR. KLEIN:  There are a couple good examples of that
25   being done.  We have cases from the Department of Corrections
```

d799jaca

in the State of Connecticut where our judge in that case

essentially created an issues liability class under Rule

23(c)(4), certified the liability issue under (b)(2)(C)(4).

And then in a stage two process, certified some issues under

(b)(3) and others for individualized assessment.  That's a

Title VII case.  It's an example where that's a very useful way

to resolve some of these individualized issues that may arise

or not.

My suggestion to the Court, your Honor, is let's see

if there's a liability determination.  If there is, then there

are lots of ways to manage those issues.  We can brief it.  It

may make sense to certify an issues class on damages for some

part or all of the case.  But we're not there yet.  We haven't

had discovery on that.  The Vulcan Society case is another

example where that was done.  Judge Garaufis certified some

phases or pieces of the damages phase of the Vulcan Society

case under (b)(3), and left other pieces for individualized

assessment.  So those are trial manageability tools that the

rule provides your Honor.  And I think that would be an

alternative way to resolve this.

I'm not sure there's a right or wrong answer to this.

I think at this stage in the case before liability

grant, before discovery on damages, I'm not sure there is an

obvious solution one way or the other.

THE COURT:  Okay.  Thank you.

d799jaca

<table>
<tr><td>1</td><td>MR. BENSON:  May I be heard, your Honor?</td></tr>
</table>

1          MR. BENSON:  May I be heard, your Honor?

2          THE COURT:  Yes.

3          MR. BENSON:  And what Mr. Klein just described is

4     exactly what the Court rejected in Comcast.  In other words,

5     that was the understanding in this circuit and in many circuits

6     prior to that decision was to do exactly what he suggested;

7     that there was a total difference between damages and liability

8     and let's put off that decision until we've established

9     liability.  Let's grant class certification and let's deal with

10    that issue of individual damages later.

11         The Court said no in Comcast.  That's what the holding

12    says.

13         THE COURT:  No.  I think you're right, that Comcast,

14    and even what the Second Circuit did in the Cuevas case, I

15    think there's some tightening of what a district court needs to

16    do at the class certification stage.  There has to be a more

17    rigorous analysis of all the requirements.

18         But I think Mr. Klein makes a good point about how in

19    that case the damages theory and the liability theory were just

20    completely apples and oranges.  They just didn't map up at all.

21    And so the Court found it fairly easy to reject on predominance

22    grounds the idea of any damages in that case.

23         But in this case there is kind of a straightforward

24    methodological approach to calculating damages even if it's

25    different numbers person by person, no?

d799jaca

1          MR. BENSON:  No.  Not given the issue of the modicum

2     of damages and whether it's going to be half-time, whether it's

3     going to be time-and-a-half, or whether it's going to be some

4     hybrid of both.

5          And think that the distinction that your Honor raises

6     between Comcast and the instant case is not necessarily

7     controlling because even though in that case, yes, there was a

8     disconnect between the theory of liability and the damages, in

9     the end of the day what that led to was the need for

10    individualized inquiries when it came to damages.  And

11    ultimately that's important in the predominance analysis

12    because it's math.  It's math.  Right.  The predominance

13    analysis is math.

14         It's do these individual issues predominate over class

15    issues?  Is this a situation where we can take representative

16    proof, individual testimony and say that's imputed to the whole

17    class?  Or is it not?  Or do we need -- or do individual issues

18    predominate?

19         So while that's a distinction in the Comcast case from

20    a factual standpoint, from the predominance analysis

21    standpoint, that is not a distinction.  And it's clear that

22    that's not a distinction because the Supreme Court after

23    Comcast, in the RBS case, which is a wage-an-hour

24    classification case, reversed and remanded and said do an

25    analysis in light of Comcast.  They are telling us that you

d799jaca

```
 1    need to do this in the wage-an-hour context.

 2              THE COURT:  Well there's a lot of scholarship on what

 3    a GVR by the Supreme Court means.  I think what it means is we

 4    want the courts of appeals to take a look at this in the first

 5    instance and at some point in a few years we'll take up the

 6    issue of how far we meant this to go.

 7              MR. BENSON:  Your colleague Judge Baer in the Wang v.

 8    Hearst case.

 9              THE COURT:  Right.  I saw that.

10              MR. BENSON:  Involving my esteemed counsel, opposing

11    counsel, rejected the notion that they're espousing here.  And

12    we think rightfully and clearly so.  He says there is GVRs and

13    then there is GVRs.

14              THE COURT:  And what did he do as a result of that?  I

15    forget.

16              MR. BENSON:  He denied class -- he basically said here

17    there were reasons to deny class certification.  But if we look

18    at damages, then there's really reasons.

19              But I don't need to go there because -- I went there

20    for other reasons, in light of Dukes.  That's where -- the

21    Dukes and Comcast must be read together.  And, again, from our

22    standpoint it's really -- it's just -- you know, class actions

23    are applicable in situations where somebody can testify:  This

24    is what happened to me.  And we can have certainty based on

25    proofs in the record that that is something that happened to
```

d799jaca

1    the class as well.  And I think that the Dukes and the Comcast

2    case have clarified that you have to be really, really careful

3    before you make that judgment.  Because when you make that

4    judgment you take away the right, you take away Duane Reade's

5    right in this case, whether it be on an individual, to say that

6    you were properly classified.  You work in XYZ store.  You

7    supervise X number of employees.  You hired ABC.  You did this.

8    You participated in this budget.  You know that's different

9    from the guy who worked up the street, you know, but we're

10   entitled to make the same defenses.  They're affirmative

11   defenses.  The application of the exemptions are affirmative

12   defenses.  An employer has a burden.  But a employer has --

13   it's a burden but it's also a right.  It's a right to make

14   those defenses.  And you can't take away that right unless

15   there is something that tells you that it's unnecessary.  It's

16   irrelevant.  It's unneeded in an individual case.  And the

17   instant cases, the perfect example where it's not, it's

18   necessary.  If you tell me that I can't question all of these

19   assistant managers about their own individual experiences both

20   from a merits standpoint and from a damages standpoint, you are

21   taking away a right from me.  And the Supreme Court has

22   clarified that before you do that you have to be very sure that

23   there are common types of proofs; that, yes, we're taking away

24   that right but we can because it's irrelevant, because it's

25   unnecessary.

d799jaca

| | |
|---|---|
| 1 | THE COURT:  Just to clarify.  This issue is about the |
| 2 | Rule 23 certification of the state law claims, right, and the |
| 3 | issue of the FLSA collective action is not at issue on this |
| 4 | motion; is that correct? |
| 5 | MR. BENSON:  Not on this motion, your Honor.  You'll |
| 6 | be getting that. |
| 7 | THE COURT:  Right. |
| 8 | MR. BENSON:  At some point. |
| 9 | But yes, this is the Rule 23 context. |
| 10 | So in closing, again, you know we think that the Court |
| 11 | is clear that, and cautious, that says before you do that, |
| 12 | Court, closely scrutinize the record.  Make sure that when |
| 13 | you're taking away a defendant's right to defend itself on an |
| 14 | individual basis that you're doing so for a really good reason. |
| 15 | No such reasons exist in this case and we think that -- |
| 16 | THE COURT:  One last question for you, sir, and that |
| 17 | is I assume -- well let me ask. |
| 18 | Do you have any -- what's your argument about a |
| 19 | bifurcated approach that would bifurcate damages from |
| 20 | liability? |
| 21 | MR. BENSON:  Well, again, you take away my right -- |
| 22 | when you certify a class you take away my right on the merits |
| 23 | to defend myself on an individual basis.  You're saying that |
| 24 | there is some common proof, there's something out there that |
| 25 | takes away that right.  And from my perspective that's where |

d799jaca

 1     Dukes come in.  Dukes and now -- I don't even think the

 2     plaintiff is arguing that Dukes doesn't apply in a wage-an-hour

 3     context.  It was unclear for a while and your Honor

 4     distinguished it in footnote one of your decision here, but

 5     it's clear that it applies.  And just like we have that right

 6     in Comcast, Dukes also gives us that right in the context of

 7     the 23(a) analysis.  And, again, you can't separate it because

 8     in the end of the day if you're ultimately going to determine

 9     my liability based on representative proof, which is what

10     ultimately happens in a class action, you've got to make sure

11     that it's for the same reason.

12               THE COURT:  Okay.  Thank you, Mr. Benson.

13               Did you reply to anything?

14               MR. KLEIN:  Just 20 seconds.

15               Your Honor in the lengthy first decision Mr. Benson is

16     correct that Judge Baer denied a motion for class

17     certification.  Subsequently, however, the judge granted our

18     unopposed motion for a 1292 interlocutory appeal to the Second

19     Circuit on that decision.  And that's now -- our petition to

20     the Second Circuit is pending on the order of certification.

21               The other point is a lot of what Mr. Benson is arguing

22     is essentially already decided.  I understood this reargument

23     to be focused on Comcast.  I'm happy to answer any questions

24     that the Court has.  But on Comcast, on the Comcast issue I

25     think we're satisfied.

d799jaca

1                THE COURT:  Okay.  Great.  Thank you all very much.

2    I'm going to excuse you all and hear from the Right Aid folks.

3                MR. KLEIN:  Your Honor would you like us to remain or

4    are we --

5                THE COURT:  You don't need to.  Totally up to you.

6                MR. KLEIN:  Thank you.

7                (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25