UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                      :

MANI JACOB *et al*.,                         :
*individually and on behalf of all others similarly*  :
*situated*,                                      :             11 Civ. 160 (JPO)
                               Plaintiffs,  :
                                           :        OPINION AND ORDER
                 -v-                        :

DUANE READE, INC. and DUANE READE  :
HOLDINGS INC.,                       :
                           Defendants.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        Plaintiffs, individually and on behalf of all others similarly situated, bring claims against

Duane Reade, Inc. and Duane Reade Holdings (collectively, "DR"), asserting that DR failed to

compensate its assistant store managers ("ASMs") for hours worked in excess of 40 hours per

week, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and the

New York Labor Law §§ 650 *et seq.* ("NYLL").  On March 20, 2013, the Court granted

Plaintiffs' motion for class certification, certifying Plaintiffs as a class with regard to their NYLL

claims pursuant to Federal Rule of Civil Procedure 23 and appointing Outten & Golden, LLP,

Klafter Olsen & Lesser, and Gottlieb & Associates as class counsel.  Before the Court is DR's

motion for reconsideration, which seeks to decertify the class in light of the Supreme Court's

recent decision in *Comcast v. Behrend*, 133 S. Ct. 1426 (2013).  For the reasons that follow,

DR's motion is granted in part and denied in part.

## I.    Background

        Familiarity with the underlying facts of this case, as set forth in this Court's two prior

opinions, is presumed.  In its opinion certifying Plaintiffs' NYLL claims, the Court determined

that Plaintiffs had satisfied Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.  *Jacob v. Duane Reade*, 289 F.R.D. 413-18 (S.D.N.Y. 2013). Additionally, the Court held that Plaintiffs had also met the predominance requirement of Rule 23(b)(3), which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* at 419 (quotations and citations omitted).

First, DR moves for reconsideration on the grounds that "intervening controlling authority," namely, the Supreme Court's recent decision in *Comcast*, as well as the Court's vacatur and remand of the Seventh Circuit's class certification of 1,129 Assistant Bank Managers in *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013), mandate decertification of this class. Specifically, in light of *Comcast*, DR contends that it is axiomatic now that "individual monetary damages claims of the class members may not predominate over the claims for injunctive relief[.]"  (Defendants' Memorandum of Law in Support, Dkt. No. 109 ("Def.'s Mem."), at 1.) Second, DR contends that "the intervening authority demonstrates that the Court improperly distinguished *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011) . . . ."  (*Id.*)  Plaintiffs respond by arguing that *Comcast*  "delves into the particular causation and predominance issues that are implicated in class-based antitrust litigation but are completely absent in an employee misclassification case."  (Plaintiff's Memorandum of Law in Opposition, Dkt. No. 112 ("Pl.'s Opp."), at 1.)  Alternatively, Plaintiffs urge the Court to employ Rule 23(c)(4)[1] and certify the class as to liability, but not as to damages.  (*See, e.g.*, Plaintiffs' Surreply, Dkt. No. 122 ("Pl.'s Surrep."), at 2 ("The only question is how to measure [damages]: through classwide proof or through individual calculations following a classwide determination of liability.").)

_____

[1] Rule Federal of Civil Procedure 23(c)(4) provides that: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues."

DR filed its motion for reconsideration on April 4, 2013 (Dkt. No. 108).  Plaintiffs

opposed the motion on April 24, 2013 (Dkt. No. 112), and DR replied on May 24, 2013 (Dkt.

No. 118).  Plaintiffs filed a surreply on June 4, 2013.  (Dkt. No. 122.)  The Court held oral

argument on the motion on July 9, 2013.

## II.    Legal Standard

"A motion for reconsideration is an extraordinary remedy to be employed sparingly in the

interests of finality and conservation of scarce judicial resources."  *Drapkin v. Mafco Consol.*

*Group, Inc* ., 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (quotations and citation omitted).  The

standard for granting a motion for reconsideration is accordingly high, *Nakshin v. Holder*, 360

Fed. App'x 192, 193 (2d Cir. 2010), and such motions "are properly granted only if there is a

showing of: (1) an intervening change in controlling law; (2) the availability of new evidence or

(3) a need to correct a clear error or prevent manifest injustice."  *Drapkin*, 818 F. Supp. 2d at

696.  Importantly, in reviewing motions for reconsideration courts will not "tolerate [] efforts to

obtain a second bite at the apple."  *Goonan  v. Fed. Reserve Bank of New York*, No. 12 Civ. 3859

(JPO), 2013 WL 1386933, at *2 (S.D.N.Y. Apr. 5, 2013).

## III.   Discussion

### A.    *Comcast* and its Effects

In *Comcast*, the Supreme Court considered the class certification of a class of more than

2 million current and former Comcast subscribers who sought damages for purported violations

of the federal antitrust laws.  133 S. Ct. at 1429-30.  Both the district court and the Third Circuit

had determined that the putative class satisfied Rule 23(b)(3)'s predominance requirement, with

the Court of Appeals holding that "[a]t the class certification stage," the proposed class did not

have to "tie each theory of antitrust impact to an exact calculation of damages."  *Id.* at 1431

3

(quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206 (3d Cir. 2011) (quotations omitted)). The Supreme Court, however, reversed, holding that Rule 23(b)(3) had not been satisfied, as the plaintiffs' model of damages fell "far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 1433. In particular, Justice Scalia's majority opinion emphasized that while "[damages] [c]alculations need not be exact" at the class-certification stage, "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Id.* (citations omitted).

The *Comcast* plaintiffs had alleged four theories of antitrust impact, but the district court accepted only one such theory as "capable of classwide proof and rejected the rest." *Id.* at 1431. The damages model proposed by plaintiffs, however, failed to "isolate damages resulting from any one theory of antitrust impact." *Id.* Upon review, the Supreme Court held that this inability to match a damages model with any one theory of liability was fatal to the class, noting that under the Third Circuit's logic, "*any* method of measurement" would conceivably be "acceptable so long as it [could] be applied classwide, no matter how arbitrary the measurements." *Id.* at 1433. In sum, the *Comcast* class was improperly certified "[i]n light of the [damages] model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *Id.* at 1435.

Several days after the *Comcast* decision, the Supreme Court vacated and remanded the Seventh Circuit's decision in *Ross v. RBS Citizens*, *N.A.*, 667 F.3d 900 (7th Cir. 2012), in which the Court of Appeals had upheld the district court's certification of two classes of Charter One bank employees. *See RBS Citizens*, 133 S. Ct. 1722. *RBS Citizens* was a case where the putative classes brought claims under both FLSA and the Illinois Minimum Wage Law ("IMWL"), and

4

the district court certified the classes for purposes of the IMWL claims after it determined that both 23(a)'s and 23(b)(3)'s requirements were met.  *See Ross v. RBS Citizens, N.A.*, No. 09 Civ. 5695, 2010 WL 3980113, at *8 (N.D. Ill. Oct. 8, 2010).

In the wake of *Comcast* and the vacatur of *RBS*, district and circuit courts alike have grappled with the scope, effect, and application of *Comcast*'s holding, and in particular, its interaction with non-antitrust class actions.  Broadly, the class-certification decisions applying *Comcast* can be divided into three, distinct groups: (1) courts distinguishing *Comcast*, and finding a common formula at the class certification stage, and thus, predominance, satisfied, *see, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 511 (9th Cir. 2013); (2) courts applying *Comcast* and rejecting class certification on the ground that no common formula exists for the determination of damages, *see, e.g.*, *Roach v. T.L. Cannon Corp.*, No. 3:10 Civ. 0591 (TJM), 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013); and (3) courts embracing a middle approach whereby they employ Rule 23(c)(4) and maintain class certification as to liability only, leaving damages for a separate, individualized determination, *see, e.g.*, *In re Motor Fuel Temperature Sales Practices Litig.*, MDL No. 1840, 2013 WL 1397125 (D. Kan. Apr. 5, 2013).

In *Leyva*, a class action involving employees of a medical product manufacturer and deliverer, the Ninth Circuit interpreted *Comcast*'s discussion of damages as requiring "that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."  716 F.3d at 514.  The *Leyva* Court distinguished *Comcast* by noting that "unlike in *Comcast*, if putative class members prove Medline's liability, damages will be calculated based on the wages each employee lost due to Medline's unlawful practices."  *Id.* Bolstering this conclusion was the presence in the record of documents reflecting "Medline's computerized payroll and time-keeping database [that] would enable the court to accurately

calculate damages and related penalties for each claim." *Id.*  Outside the wage and hour context,

some other courts have taken a similar approach to *Levya*.  For example, in *In re Diamond*

*Foods, Inc., Sec. Litig.*, No. 11 Civ. 5386, 2013 WL 1891382 (N.D. Cal. May 6, 2013), the court

held that Rule 23(b)(3) class certification was proper, despite *Comcast*, in a securities fraud class

action.  The *Diamond* Court noted that "[w]hether [a] plaintiff will ultimately prevail in proving

damages is not necessary to determine at [the certification] stage." *Id.* at *12.  By contrast, the

question at the class certification stage, in light of *Comcast*, was only "whether [a] plaintiff has

met its burden of establishing that damages can be proven on a classwide basis." *Id.*  The

*Diamond* Court held that the putative class had indeed met its burden by proffering evidence of

"an event study that analyze[d] the impact of Diamond's disclosures on the share price." *Id.* at

11.  The Court noted that this so-called "event study method" was an accepted approach to

determining damages to a class of stockholders. *Id.* at *12.

      And finally, in *In re High-Tech Employee Antitrust Litig.*, 189 F.R.D. 555 (N.D. Cal.

2013), a class action brought by software engineers alleging violations of the Sherman Act,

California's Cartwright Act, and California's Unfair Competition law, the court found *Comcast*

similarly unproblematic.  The *High-Tech* Court, like the Ninth Circuit in *Leyva*, found *Comcast*

to stand for the proposition that a putative class's *methodology* for proving damages must be tied

to its theory of liability. *Id.* at 582.  In support of this position, the *High-Tech* Court cited

Justices Ginsburg's and Breyer's joint dissent in *Comcast*, which took pains to highlight that the

majority opinion "breaks no new ground on the standard of certifying a class action under

Federal Rule of Civil Procedure 23(b)(3)." *Comcast*, 133 S. Ct. at 1433 (Ginsburg and Breyer,

JJ., dissenting).  In fact, as *High-Tech* notes, the *Comcast* dissent seeks to limit the reach of the

majority opinion by clarifying that "the decision should not be read to require, as a prerequisite

to certification, that damages attributable to a class-wide injury be measurable 'on a class-wide basis.'" *Id.* (same) (quotations and citation omitted).  In *High-Tech*, the court was satisfied that plaintiffs' expert had provided a regression model that was capable of estimating "the aggregate undercompensation to Defendants' employees on a year-by-year and defendant-by-defendant basis," which occurred as a result of "Defendants' challenged conduct in terms of a percentage of wage suppression during the periods when anti-solicitation agreements were in effect for each Defendant." *High-Tech*, 289 F.R.D. at 582; *see also Astiana v. Kashi Co.*, No. 3:11 Civ. 01967-H, 2013 WL 3943265, at *11 (S.D. Cal. July 30, 2013) (holding that the plaintiffs had sufficiently "represent[ed] that they can calculate the total restitutionary damages based upon sales, profits and prices data from records generally maintained by Kashi," and noting that "[i]f individual issues as to how much reward each class member is entitled later predominate, the Court can address such concerns at that time" and certifying a limited class of "[a]ll California residents who purchased Kashi Company's food products on or after August 24, 2007 in the State of California that were labeled 'Nothing Artificial' but which contained [certain ingredients]"); *Barfield v. Sho-Me Power Electric Coop.*, No. 11 Civ. 4321, 2013 WL 3872181, at *8 (W.D. Mo. July 25, 2013) (rejecting the defendants' contention that damages could only be assessed on a "case-by-case" basis and holding instead that "the value of the use of each class member's land for commercial fiber optic telecommunications purposes is a function of the value of the entire fiber optic network, or "corridor," divided by the number of linear feet of fiber optic cable on Plaintiffs' property," providing a method of "corridor valuation" that was uniform, calculable, and endorsed by an expert).

Other courts have similarly held that *Comcast* does not act as a bar to class actions where the plaintiffs provide a workable damages model.  *See, e.g.*, *Parra v. Bashas', Inc.*, No. Civ. 02-

0591, 2013 WL 2407204, at *32 (D. Ariz. May 31, 2013) (holding that grocery store employees'

model for calculating back pay survived *Comcast*, as, similar to *Levya*, "through a computer

program, and relying upon 'objective factors' such as 'the individual employee payroll record

(dates of employment job position, hours worked) and the wage scale,' which is part of the

record, the plaintiffs will be able to calculate back pay losses for '*each* eligible class member'");

*Munoz v. PHH Corp.*, No. 1:08 Civ. 0759, 2013 WL 2146925, at *25 (E.D. Cal. May 15, 2013)

("Here, Plaintiffs can ascertain classwide damages directly attributable to their liability case.

Plaintiffs' liability case is predicated on the theory that Defendants' captive reinsurance

arrangement violated section 8 of RESPA.  If liability is proven, the damages for this violation

are provided by statute, and call for three times the amounts paid for Defendants' settlement

service."); *accord Barbosa v. Cargill Meat Solutions Corp.*, No. 1:11 Civ. 275, 2013 WL

3340939, at *9 n.2 (E.D. Cal. July 2, 2013) ("Plaintiffs assert that *Behrend* is distinguishable

from a wage-and-hour class action case such as this, and is not applicable to the certification of

the settlement class at issue here.  Specifically, Plaintiffs assert that this case is susceptible to

awarding damages on a classwide basis and unlike in *Behrend*, there is no damages model that

improperly measures a broader pool of damages that conflict with a more narrowly defined class.

The Court finds that Plaintiffs have adequately distinguished *Behrend*, and its holding does not

preclude certification of a settlement class under the circumstances of this case." (internal

citation omitted)).

      Taking the opposite approach from the aforementioned cases are those courts that have

interpreted *Comcast* more broadly, as requiring a heightened damages inquiry at the class

certification stage.  According to this latter view, in order to advance as a certified class,

plaintiffs must offer "a damages model susceptible of measurement across the entire class," and

this determination cannot be extracted from the inquiry governing liability. *See Roach*, 2013 WL 1316452, at *3. In *Roach*, the plaintiffs asserted violations of FLSA and NYLL, claiming that the defendant's corporate policy denied them pay to which they were entitled while working at the defendant's Applebees restaurants. Specifically, the plaintiffs claimed that the defendant had failed to pay them in accordance with a since-repealed New York state regulation that provided as follows: "[o]n each day in which the spread of hours exceeds 10, an employee shall receive one hour's pay at the basic minimum hourly wage before allowances, in addition to the minimum wages otherwise required by this Part." *Id.* at *2 (quoting 12 N.Y. C.R.R. 137-1.7 (2010) (quotations and citations omitted)). The *Roach* plaintiffs did not provide a damages model, instead arguing that damages are separate from liability, contending that "damages need not be considered for Rule 23 certification even if such damages might be highly individualized." *Id.* at *3. Judge McAvoy found that the plaintiffs' position was "in contravention of the holding of *Behrend.*" *Id.* Moreover, after his own "demanding and rigorous analysis of the evidentiary proof on this [spread of hours] claim," Judge McAvoy concluded that damages within the proposed class were "highly individualized." *Id.* Accordingly, the *Roach* plaintiffs' motion for class certification was denied in light of *Comcast*.

Other courts, applying *Comcast* with the same breadth, have reached similar conclusions. *See, e.g.*, *Cowden v. Parker & Associates, Inc.*, Civ. A. No. 5:09-323, 2013 WL 2285163, at *7 (E.D. Ky. May 22, 2013) (holding that where insurance-agent plaintiffs alleged that their employer withheld certain commissions and charged excessive fees, damages were too individualized to support class certification, as "[t]he only way to resolve those issues is to analyze each agent's account and those individual analyses will overwhelm any of the common issues in this matter"); *Forrand v. Fed. Exp. Corp.*, No. Civ. 08-1360, 2013 WL 1793951, at *4

9

(C.D. Cal. Apr. 25, 2013) (denying certification of a proposed class of FedEx workers who were paid from their scheduled start time to their scheduled finish time, instead of from clock-in to clock-out time, holding, under *Comcast*, that the proposed class raised "factual questions" as to whether individual employees were "in fact working and/or whether the employee[s] [were] under the employer's control during the grace period," which, in turn, "underscore[d] the inappropriateness of Rule 23(b)(3) certification" (quotations omitted));[2] *see also Guido v. L'Oreal, USA, Inc.*, No. Civ. 11-1067, 2013 WL 3353857, at *15-16 (C.D. Cal. July 1, 2013) (denying motion for class certification without prejudice in false advertising case where plaintiffs had "not submitted expert testimony actually demonstrating a gap between the true market price of [the product at issue] and its historical market price," meaning plaintiffs had "not met their burden of demonstrating that common questions predominate over individual issues regarding classwide relief," and citing *Comcast* for the proposition that "courts can only certify a Rule 23(b)(3) class if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability").

In grappling with *Comcast*, a third approach has been employed by some courts, and alluded to in others, involving use of Rule 23(c)(4)[3] and a more limited application of *Comcast*.

---

[2] The *Forrand* Court also denied certification of plaintiffs' working meal break claim, stating that under *Comcast*, "the need for individualized fact inquiries dominates the determination of liability and damage issues."  2013 WL 1793951, at *5.  While the Court found the named plaintiff's evidence associated with the working meal break claim to be "applicable to the class as a whole," it found class certification inappropriate in light of Plaintiff's failure to "tie [Plaintiff's] allegation that FedEx failed to pay employees for time spent working on meal breaks to a proper and reliable measure of damages for work done on those breaks, particularly [in light of California law that requires such a plaintiff to] prove that FedEx 'knew or reasonably should have known that the worker was working through the authorized meal period.'"  *Id.*

[3] Rule 23(c)(4) reads as follows: "*Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues."

10

For example, in *In re Motor Fuel*, 2013 WL 1397125, the court, in certifying a consumer class seeking damages against motor fuel retailers that purportedly sold fuel without disclosing or adjusting for effects of temperature on fuel in breach of their duty of good faith and fair dealing, applied pre-*Comcast* precedent allowing for bifurcation of liability and damages where damages calculations were too individualized to be resolved at the classwide level.  *See id.* at *19 ("For these reasons, and in light of the common questions discussed above which predominate over individual issues, under Rule 23(b)(3) the Court certifies the 'liability' aspects of plaintiffs' claims for unjust enrichment and breach of the duty of good faith and fair dealing, and for violation of the UCL and CLRA.").  Chevron, a defendant in the three related cases at issue in *In re Motor Fuel*, argued "that plaintiffs' claims require[d] individualized proof based on the circumstances of each fill-up, including the temperature of the fuel, whether the class member would have paid less or received more fuel for the same price with [automatic temperature compensation or "ATC"] and whether Chevron purchased fuel at wholesale on a temperature-adjusted basis at the time of each transaction."  *Id.* at *18.  The court, however, disagreed, holding that such inquiries were unnecessary, as plaintiffs had alleged that "Chevron treated all class members the same in all material respects."  *Id.*  Admitting that "each class member[']s[] damages, if any, [might] require individualized determinations," the Court found it permissible under Rule 23(c)(4) and circuit precedent to bifurcate the proceedings, "[b]y certifying the liability and injunctive relief aspects of plaintiffs' claims in a (b)(3) class," and thus "avoid[ing] any actual or perceived conflict with *Dukes* [and *Comcast*]."  *Id.* at *18-19.

Similarly, a district court in Michigan recently certified a class for liability purposes in a § 1983 putative class action against the state's treasurer, alleging that the Michigan Department

of Treasury's uniform practice of entering and seizing property without an authorized warrant violated the Fourth Amendment. *Miri v. Dillon*, No.11-15248, 2013 WL 2034310 (E.D. Mich. May 14, 2013). In *Miri*, the defendants argued, *inter alia*, that predominance was not satisfied as there were myriad questions as to what type of damages, if any, the putative class members suffered as a result of the purported Fourth Amendment violation. *See id.* at *10 ("The remainder of Defendants' predominance arguments focus on damages, not liability, i.e., questions whether, as a result of Defendants' alleged constitutional violation, Plaintiffs or members of the putative class filed for bankruptcy, remained open or shut down, suffered damage to their business reputation, or had a substantial or relatively small amount of property seized."). Citing the *Comcast* dissent, the *Miri* Court stated that historically, courts have recognized that "individual damages calculations do not preclude class certification under Rule 23(b)(3)." *Id.* at *11 (citing *Comcast*, 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting)). However, "[i]n an abundance of caution," the *Miri* court chose to certify the class for liability purposes only. *Id.* ("Finally, this Court finds that a class action for liability purposes only is both a superior and manageable method of adjudication. It will provide significant economies of time, effort, and expense for the litigants and the Court in light of the predominance of common questions of fact and law regarding liability.").

Commentators have suggested that the type of bifurcation employed in *In re Motor Fuel* and *Miri* may become a common approach for courts grappling with the reach and effect of *Comcast*. *See, e.g.*, Ellen Meriwether, *Comcast Corp. v. Behrend: Game Changing or Business As Usual?*, Antitrust, Summer 2013, at 57, 61 (noting the conflicting approaches employed by the *Roach* and *In re Motor* Courts); 54 Am. Jur. 2d Monopolies and Restraints of Trade § 442 ("Bifurcation enables a court to certify a class action on the issue of liability only, leaving the

12

question of individual class members' damages to be tried separately.  Class certification may be

proper even though individualized proof of impact or fact of damage is required, particularly

where such proof is simple or mechanical.  Yet, if questions of impact or fact of damage require

complex, individualized proof, then the common issues cannot be said to predominate for

purposes of Rule 23(b)(3)." (footnotes omitted)).  Additionally, the Tenth Circuit, in a recent

opinion remanding a class certification case for further consideration, identified the importance

of a district court's role in determining how to structure class certification litigation in light of

both *Comcast* and the Federal Rules.  *See Wallace B. Roderick Revocable Living Trust v. XTO*

*Energy, Inc.*, 12-3176, 2013 WL 3389469, at *5-6 (10th Cir. July 9, 2013) ("Although

'individualized monetary claims belong in Rule 23(b)(3),' *Wal-Mart,* 131 S.Ct. at 2558,

predominance may be destroyed if individualized issues will overwhelm those questions

common to the class. . . . That said, there are ways to preserve the class action model in the face

of individualized damages. . . . *But we believe the district court is in the best position* to evaluate

the practical difficulties which inhere in the class action format, and is especially suited to tailor

the proceedings accordingly." (citations omitted) (emphasis added)).

　　　　While bifurcation, or some use of Rule 23(c)(4) to certify the class in a limited fashion, is

clearly an aspect of the post-*Comcast* landscape, the extent to which such procedures may be

used remains a shifting reality.  For example, prior to *Comcast*, the courts of appeal were split on

the issue as to whether, when common issues or questions fail to predominate over an entire

claim or action, a court may properly "isolate the common issues under Rule 23(c)(4)[] and

proceed with class treatment of these particular issues."  *In re Nassau Cty. Strip Search Cases*,

461 F.3d 219, 226 (2d Cir. 2006) (quoting *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234

(9th Cir. 1996) (quotations and citations omitted)).  The Second Circuit, together with the Sixth,

13

Seventh, and the Ninth Circuits subscribe to the view that Rule 23(c)(4)'s plain language operates as more than a mere "housekeeping rule," and thus permits the certification of some issues, such as liability, but not others.  *In re Motor*, 2013 WL 1397125, at *6-7 (citing cases and discussing split among circuits).  By contrast, the Fifth Circuit "has adopted a 'strict application' of Rule 23(b)(3)'s predominance requirement," reading Rules 23(b)(3) and (c)(4) to require "that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."  *Nassau*, 461 F.3d at 226 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) (quotations omitted)).

While *Comcast* itself fails to speak to the use and scope of Rule 23(c)(4), the Supreme Court did vacate and remand, in light of its *Comcast* ruling, a Sixth Circuit decision that had certified a class for liability purposes only.  *See Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 (2013) (vacating and remanding 678 F.3d 409 for further consideration in light of *Comcast*).  In *In re Whirlpool Corp. Front-Loading Washer Products Liability Litig.*, 678 F.3d 409 (6th Cir. 2012), the Sixth Circuit had affirmed the district court's certification below of a Rule 23(b)(3) class of consumers, alleging various causes of action against the manufacturer of front-load washing machines.  The *Whirlpool* district court had reserved proof of damages for individual determination, which the Sixth Circuit affirmed as well, citing precedent permitting certification even in the face of individualized damages determinations.  *See In re Whirlpool*, 678 F.3d at 419 ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action." (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).  The Sixth Circuit also, assuming success on the merits, suggested that the district court might divide the class members into sub-

14

classes for the purpose of determining damages. *Id.* at 421 ("For the purpose of determining damages, class members who were injured at the point of sale and also experienced a mold problem might be placed in one Rule 23(b)(3) subclass, while class members who were injured at the point of sale but have not yet experienced a mold problem might be placed in a separate Rule 23(b)(3) subclass. Alternatively, the class members who have not experienced a mold problem might be placed in a Rule 23(b)(2) subclass to allow any declaratory or injunctive relief necessary to protect their interests." (citation omitted)).

Divining the Supreme Court's intent from a so-called "GVR order" is the subject of much scholarship and little clarity; suffice it to say that the vacatur and remand of *In re Whirlpool* does not necessarily speak to the propriety of liability-only certification in a post-*Comcast* world. The Sixth Circuit, on remand, acknowledged this obfuscation and construed the Supreme Court's GVR similarly, noting that the "law is clear that a GVR order does not necessarily imply that the Supreme Court has in mind a different result in the case, nor does it suggest that our prior decision was erroneous." *In re Whirlpool Corp. Front-Loading Washer Products Liability Litig. (Whirlpool II)*, No. 10-4188, 2013 WL 3746205, at *1 (6th Cir. July 18, 2013). In light of its view of the GVR, the Sixth Circuit declined to remand the matter to the district court, holding that "the present GVR order require[d] [the court] to consider only whether *Comcast Corp.* has any effect on [its] Rule 23 analysis affirming the district court's certification of a liability class." *Id.* at *2.

Instead of remanding the case, the Sixth Circuit, in reviewing the district court's certification and its prior affirmance in light of *Comcast*, was "satisfied that the [district] court considered relevant merits issues with appropriate reference to the evidence," as required by *Dukes* and *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184 (2013), despite

15

its favorable citation of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), in which the

Supreme Court "expressed the view that 'nothing in either the language or history of Rule 23 . . .

gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to

determine whether it may be maintained as a class action.'"  *Whirlpool II*, 2013 WL 3746205, at

*8.  The *Whirlpool II* court also again discussed the Rule 23(a) requirements, noting in

particular, with respect to commonality, that despite defendant's arguments, "the trial of

common questions will evoke common answers likely to drive resolution of this lawsuit."  *Id.* at

*14 (citation omitted).  According to the Sixth Circuit, the lead plaintiffs, like all Ohio owners of

the particular Whirlpool model at issue in the case, were allegedly injured "immediately upon

purchase of a Duet [model of washer] due to the design defect in, and the decreased value of, the

product itself, whether mold causing additional consequential damages has yet manifested or

not."  *Id.*  For this reason, the district court did not abuse its discretion in finding commonality

and typicality, despite the fact that some class members had experienced mold growth and others

had not, and, despite the reality that all class members had varied laundry habits.  *Id.* at 14-15.

 With respect to predominance, the *Whirlpool II* court emphasized that *Amgen* stands for

the enduring principle that "the predominance inquiry must focus on common questions that can

be proved through evidence common to the class," but a plaintiff class "need not prove that each

element of a claim can be established by classwide proof."  *Id.* at *15 (citation omitted).

"Following *Amgen*'s lead," the Sixth Circuit upheld the district court's predominance

conclusion, finding "that liability questions common to the Ohio class—whether the alleged

design defects in the Duets proximately caused mold to grow in the machines and whether

Whirlpool adequately warned consumers about the propensity for mold growth—predominate

over any individual questions."  *Id.* at *16.  In other words, the evidence required for the claims

16

at issue in *Whirlpool* "will either prove or disprove as to all class members whether the alleged design defects caused the collection of biofilm, promoting mold growth, and whether Whirlpool failed to warn consumers adequately of the propensity for mold growth in the Duets." *Id.* (citations omitted).

And finally, in applying *Comcast*, the *Whirlpool II* court determined that the Supreme Court's decision, while offering further instruction on the "necessary predominance inquiry," failed to "change the outcome" of the court's prior Rule 23 analysis. *Id.* In particular, the court noted that *Comcast* dealt with the certification of both "a liability *and* damages class under Rules 23(a) & (b)(3)." *Id.* For the *Whirlpool II* court, the fact that the district court had certified only the liability class meant that *Comcast* had "limited application," as damages were not at issue. *Id.* at *17 ("Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application."). Similar to the *Levya* court, the Sixth Circuit also noted that "[t]o the extent that *Comcast Corp.* reaffirms the settled rule that liability issues relating to injury must be susceptible of proof on a classwide basis to meet the predominance standard," that requirement was fully satisfied as to the *Whirlpool* class. *Id.* (citation omitted).

Taking this jurisprudence into account, the Court finds it most logical to construe *Comcast* as requiring a baseline inquiry into damages at the certification phase—meaning that the putative class's theory of liability must track its theory of damages. Put another way, there cannot be a mismatch between the injury and the remedy, as there was between the single variant of antitrust impact—the overbuilder competition—and the generalized model of damages provided by the *Comcast* plaintiffs. *See Comcast*, 133 S. Ct. at 1435 ("'The first step in a

17

damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'  The District Court and the Court of Appeals ignored that first step entirely." (internal citation omitted)).

Even if this linkage requirement is met, together with all the other strictures of Rule 23(a) and (b), it is still quite possible, however, that individualized determinations or proof might be required at the damages phase.  For example, where an employer fails to keep computerized or otherwise accessible records, contacting employees individually might be required in a wage and hour case, even where those employees' theory of liability—lack of payment for overtime wages in violation of state law—tracks completely its theory of damages—payment of time and one-half, as prescribed by statute, for each hour worked above 40.  Accordingly, those individual damages accounts might indeed predominate over the common questions linking the class together for liability purposes.  The dissent in *Comcast* seems to suggest that the presence of such individualized proof with respect to damages does not act as a bar to certification.  *See* 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." (citations omitted)).   Nevertheless, reading *Dukes* and *Comcast* together, it appears that there are due process implications for defendants, which render the so-called "trial by formula" approach, whereby representative testimony is utilized to determine damages for an entire class, inappropriate where individualized issues of proof overwhelm damages calculations.  *Compare Dukes*, 131 S. Ct. at 2561 ("[A] class cannot be certified on the premise that Wal–Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being 'incidental' to the classwide injunction, respondents' class could not be certified even assuming, *arguendo*, that 'incidental' monetary

18

relief can be awarded to a 23(b)(2) class."), *with Comcast*, 133 S. Ct. at 1434 ("Under that logic,

at the class-certification stage *any* method of measurement is acceptable so long as it can be

applied classwide, no matter how arbitrary the measurements may be.  Such a proposition would

reduce Rule 23(b)(3)'s predominance requirement to a nullity.").

If the Court accepts the premise that the necessity of individualized proof, with respect to

damages, may indeed defeat the predominance requirement, the next inquiry relates to the extent

to which this determination affects the certification of other discrete issues, such as liability.

While *Comcast* surely requires some inquiry into the relationship between injury and damages at

the class certification stage, this Court understands *Comcast* to require a linkage between those

two, rather than forbidding bifurcation in the event of individualized proof.  In fact, the *Comcast*

majority's primary concern was the inability of the putative class to match their damages

methodology to the single, viable, overbuilder theory of antitrust impact.  *See Comcast*, 133 S.

Ct. at 1434 ("This methodology might have been sound, and might have produced commonality

of damages, if all four of those alleged distortions remained in the case.  But as Judge Jordan's

partial dissent pointed out: '[B]ecause the only surviving theory of antitrust impact is the

clustering reduced overbuilding, for [the proposed methodology] to be relevant, [the] benchmark

counties must reflect the conditions that would have prevailed in the Philadelphia DMA but for

the alleged reduction in overbuilding.'" (citing *Behrend*, 655 F.3d at 216 (Jordan, J., concurring

in part and dissenting in part)).  *Comcast* does not, however, establish a rule that prohibits

certification of solely a liability class in the face of individualized proof of damages.  In fact,

were the Court to interpret *Comcast* to adopt such a rule, employers would be subject to a

perverse incentive: maintain company-wide, computerized, and generally accessible records of

overtime hours and face class action litigation or rely on individual agreements and employee-

by-employee records and defeat class certification in every instance.  Therefore, "in the absence of authority to the contrary, [the Court is] not inclined to extend *Comcast* beyond its facts and holding.  Thus, *Comcast* does not foreclose a district court from certifying a liability only class under Rule 23(c)(4) . . . ."  *Wallace v. Powell*, No. 3:09 Civ. 286, 2013 WL 2042369, at *19 (M.D. Pa. May 14, 2013).

To summarize, *Comcast* requires that a putative class seeking Rule 23(b)(3) certification demonstrate a linkage between its theory of liability and its theory of damages.  The Court must examine this relationship at the class certification stage, even where the inquiry overlaps with, or is "pertinent to[,] the merits determination."  133 S. Ct. at 1432-33.  After establishing this linkage, certification of both liability and damages together may nevertheless prove untenable in light of *Dukes*, as due process concerns imbue defendants with the right to defend each claim when damages are too individualized.  Nothing in *Comcast*, however, vitiates the longstanding principle in this Circuit that courts may certify a class as to liability, but not damages, utilizing Rule 23(c)(4), so long as the proposed liability class meets the requirements of Rule 23(a) and (b).  *See, e.g.*, *Wallace*, 2013 WL 2042369, at *19.  Of course, "[c]ourts should use Rule 23(c)(4) [] only 'where resolution of the particular common issues would materially advance the disposition of the litigation as a whole.'"  *In re Motor*, 2013 WL 1397125, at *7 (citations omitted).  Accordingly, where so-called "noncommon issues are inextricably entangled with common issues or . . . the noncommon issues are too unwieldy or predominant to be handled adequately on a class action basis," bifurcation or limited certification under Rule 23(c)(4) is inappropriate.  *Id.* (quotations and citations omitted).

Rule 23(c)(4) cannot cure every ill that troubles a putative class.  It can, however, serve as a useful and fair case management tool where (1) damages track liability in the manner

contemplated by *Comcast*; (2) Rules 23(a) and (b) are satisfied as to common issues; and (3)

individualized issues of proof predominate over a discrete, uncommon issue, such as damages,

and due process impels that a defendant have the opportunity to respond to such individual

positions.  Accordingly, in the vein of *In re Motor*, *Miri*, *Wallace*, and *Whirlpool II*, the Court

construes Rule 23(c)(4) as a viable option within the context of classwide damages.

### B.    Application of Law to Facts

Here, the gravamen of DR's motion for reconsideration is that individualized damages

calculations defeat predominance.  (Def.'s Mem. at 3.)  DR's position is that *Comcast*'s holding

invalidates prior decisions that "relegate the assessment of damages to a minor role in Rule

23(b)(3) analysis."  (*Id.* at 4.)  With damages now clearly at the forefront of the 23(b)(3) inquiry,

DR claims, "[w]ere this case to proceed to trial, and were Plaintiffs to prevail on the issue of

liability, the jury would be required to undergo a time-consuming, painstaking review of the

eligibility of each of the approximately 750 class members for unpaid overtime pay, and to

calculate how much overtime pay each individual was entitled to receive."  (*Id.* at 5.)  To deny

DR's right to have such testimony, DR contends, would be akin to a due process violation, as

proscribed by *Dukes*, because each individual is entitled to a different amount of overtime pay.

In response, Plaintiffs cite *Leyva*, 716 F.3d 510, as standing for the proposition that the overtime

wages each employee loses in a wage and hour, misclassification case constitutes a formula, as

imagined by the *Comcast* majority, that tracks the theory of liability and is capable of classwide

proof.  (Pl.'s Surrep. at 2-3.)

Plaintiffs' reliance on *Leyva* in this particular instance is misplaced, however, as the

situation in that case varied from that at issue here.  In *Leyva*, the plaintiffs—current and former

hourly employees of Medline—sought certification of four separate sub-classes based on four,

distinct violations of California law: (1) a rounding violation class, comprising employees who would perform unpaid work before their official start times; (2) a bonus violation class, constituting employees alleging the exclusion of "nondiscretionary bonuses from employees' overtime rates, thus lowering overtime pay"; (3) a waiting time penalties class, referring to those terminated employees owed monies under California Labor Law, due to rounding and bonus violations; and (4) a wage statement penalties class, consisting of those plaintiffs alleging "that because of the rounding and bonus violations, Medline's payroll records did not accurately record the hours employees worked and the wages they earned," in violation of California labor laws.  716 F.3d at 512.  In the *Leyva* record, Medline had provided evidence of a "computerized payroll and time-keeping database [that] would enable the court to accurately calculate damages and related penalties for each claim."  *Id.* at 514.  Moreover, "in its removal notice, Medline used its electronic database to separately calculate its exposure for each putative class member's claim."  *Id.*  In fact, "Medline listed the amount in controversy for each individual claim and totaled the exposure on all the claims, calculating a total amount in controversy of $5,934,761," thus highlighting that not only did classwide damages track the theory of liability for each subclass, but also "that damages could feasibly and efficiently be calculated once the common liability questions are adjudicated."  *Id.*

Here, both Plaintiffs and DR agree that DR maintains some species of a "swipe-card" system that records "at least some of the hours worked by ASMs."  (Pl.'s Opp. at 12.)  The presence of records, however, does not automatically convert the instant case into the situation in *Leyva*.  As DR points out, there are at least three different subsets of ASMs: (1) ASMs who believed their salary was designed to cover 40 hours of work per week, or "standard employees"; (2) ASMs who believed their salary was to cover however many hours they worked a week, or

22

so-called "fluctuating workweek" ("FWW") employees; and (3) employees who understood their salary to cover work up to a certain number of hours per week, such as 60, but no more: the "hybrid employees."  (Defendant's Reply Memorandum of Law, Dkt. No. 118 ("Def.'s Rep."), at 2.)  The classification of employees is significant, as the statutory measure of damages may vary depending on which category is associated with a given ASM.  Moreover, the category into which a particular ASM is placed depends upon his salary, hours, and in some instances his understanding of how many hours a week his salary was intended to cover.  Defendants have pointed to evidence suggesting that discerning an ASM's salary, together with the hours the salary was meant to cover, would, in many cases, require an inquiry into each class member's circumstances.  This process would be time-consuming and supremely incapable of "classwide proof," as some agreements with DR were oral or informal, and others were written.

Regarding the actual overtime calculation, the regular rate of pay for each DR employee must be calculated using the aforementioned evidence, and after that calculation, the employee would receive a certain statutory amount for all hours worked above 40, or in the case of the hybrid employees, for all hours worked above the agreed upon number of hours.  First, for example, with respect to standard employees, if the class were to prevail for liability purposes, they would receive one and one-half times their regular rate of pay for all hours worked above 40 in a workweek.  *See* 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.107; 12 N.Y.C.R.R. § 146-1.4. Second, Defendants argue, the rate of overtime pay to which the FWW group would be entitled would constitute only half-time wages for every hour over 40 an employee worked in a given workweek.  29 C.F.R. § 778.114.[4]

---

[4] Section 778.114(a) reads as follows:

It is not clear, however, that Defendants are correct in their interpretation of the FWW's applicability to misclassification cases, as § 778.114, the regulation which discusses the FWW, is silent as to its relevance to a misclassification case such as this one. *See Wallace v. Countrywide Home Loans Inc.*, No. SACV 08-1463, 2013 WL 1944458, at *3-7 (C.D. Cal. Apr. 29, 2013) (citing cases, noting split, and analyzing each approach). The First, Fifth, and Tenth Circuits have all found § 778.114 applicable in misclassification cases, thus determining that the appropriate measure of damages for a misclassified, FWW employee would constitute half-time of that employee's regular rate of pay. *See Celments v. Serco, Inc.*, 530 F.3d 1224 (10th Cir. 2008); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35 (1st Cir. 1999); *Blackmon v. Brookshire*

---

An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

*Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988).  Other circuits have utilized the FWW, half-time

method to calculate misclassification damages, employing the reasoning of the original FWW

case, *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942), but have declined to

apply § 778.114 to reach that result.  *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630

F.3d 351 (4th Cir. 2011); *Urnikis–Negro v. Am. Fam. Property Servs.*, 616 F.3d 665 (7th Cir.

2010).  Many district courts, however, most notably in the Second and Ninth Circuits, have held

the FWW method to be inappropriate in misclassification cases, construing the FWW method's

applicability as dependent on two criterion that are necessarily missing in any successful

misclassification case: (1) a "clear mutual understanding that the employer will pay the

employee a fixed salary regardless of the hours worked;" *and* (2) the contemporaneous payment

of a fifty percent overtime premium in excess of all hours above 40 in a given workweek.  *See*

*Ayers v. SGS Control Servs., Inc.*, No. 03 Civ. 9078 (RMB), 2007 WL 3171342, at *2 (S.D.N.Y.

Oct. 9, 2007) (citation omitted); *see also Stein v. Guardsmark, LLC*, No. 12 Civ. 4739, 2013 WL

3809463 (JPO), at *3 n.4 (S.D.N.Y. July 23, 2013) (discussing the difficulty of applying the

FWW method to misclassification cases).  Necessarily, these courts conclude, in a successful

misclassification case, mutual understanding and certainly contemporaneous overtime payment

will both be lacking, rendering § 778.114 inapplicable.  Nevertheless, despite this split in

authority, DR contends that the FWW employees, even if misclassified, would be entitled to half

time their regular rate of pay for all hours worked above 40.

Taking this methodology a step further, DR contends that the damages of the third and

final group of ASMs—the hybrid employees—would mandate two separate calculations.  First,

assuming that DR could show the existence of an enforceable agreement between a given ASM

and DR that the ASM's salary was designed to cover, for example, a 60-hour workweek, the

regular rate of pay for that employee would be calculated by dividing the salary by 60-hours.

That employee, according to DR, would be eligible for half-time payment for all hours between

40 and 60 and time and one-half for all hours over 60.  The Court, however, disagrees with DR's

interpretation of the hybrid employees' rate.  It seems, even if FWW applied to a

misclassification case,  and, in this situation, even if DR could show a salary arrangement by

which an ASM was paid by a fixed salaried rate, that individual would not constitute a FWW

individual at all, as, by its plain terms, § 778.114 refers to a circumstance "[w]here there is a

clear mutual understanding of the parties that the fixed salary is compensation (apart from

overtime premiums) for the hours worked each workweek, whatever their number, rather than

for working 40 hours *or some other fixed weekly work period* . . . ."  29 C.F.R. § 778.114(a)

(emphasis added).  Accordingly, a workweek of 60 hours would not constitute a FWW in the

sense imagined by the regulation.  Thus, the Court sees no reason why such a hybrid employee,

if misclassified, would not simply receive the normal, one and one-half times rate of overtime

pay for hours in excess of 60.

The unsettled nature of the FWW's applicability in misclassification cases, and the

varied, proposed methods of overtime pay calculation for various employee types aside, the

aforementioned subsets of ASMs do represent a fundamental obstacle in terms of classwide

damages calculation.  Regardless of whether a given ASM is of the standard, FWW, or hybrid

variety, all overtime calculations require first a determination of that employee's regular rate of

pay, which is defined as the regular hourly rate of pay during a workweek.  29 C.F.R. § 778.109.

This rate is generally calculated by "dividing the salary by the number of hours which the salary

is intended to compensate."  *Id.* at § 778.113(a).  For FWW ASMs, regardless of whether they

are eligible for half-time or time and one-half for their overtime, their regular rate of pay must be

calculated per week. *Id.* at § 778.114(b). To utilize the example from the applicable regulation, an employee who is paid $600 per week, with the mutual understanding that his salary is to cover all hours in the workweek, would have the following regular rates for the listed weeks: 40-hour week ($15.00 or $600/40); 37.5-hour week ($16.00 or $600/37.5); 50-hour week ($12.00 or $600/50); and 48-hour week ($12.50 or $600/48). By contrast, the calculation of the regular rate of pay for a standard ASM, or a so-called hybrid ASM (assuming all hybrid ASMs' salaries were intended to cover the same number of hours per-week, which is not necessarily the case given variance within the record), would simply involve the division of a salary by the hours per week that the salary was intended to compensate; there would be no need to do a week-by-week analysis for such ASMs. Accordingly, the calculated regular rate of pay could then be utilized to multiply 150% of the rate and the number of hours worked above 40 (or, perhaps 60) per week. The FWW ASMs, however, would require an ASM-by-ASM and week-by-week analysis. This is because, as demonstrated above, FWW employees' regular rate of pay—and accordingly the rate by which their overtime is calculated—varies by week, depending on how many hours they work.

Plaintiffs assert that the regular rate of pay reflects an objective test, capable of classwide proof. (Pl.'s Surrep. at 1.) This formula may be objective, but it is not capable of classwide proof in this particular instance. Since there are at least three different classes of ASMs, there would first need to be a determination of the sub-class to which each ASM belonged: standard, FWW, or hybrid. This determination alone would require individualized, miniature trials, as the Court would be required to examine offer letters, contracts, or in some cases, oral testimony of each class member and DR. After that point, the regular rates of pay would have to be calculated, which for FWW ASMs, as discussed, would require another layer of individualized

analysis.  Here, DR's due process rights could be violated if the Court were to simply assume

that all ASMs were of the standard, FWW, or hybrid variety.  Such an assumption would also

work an inequity, providing some ASMs with a windfall while undercompensating still others.

In light of *Comcast*, these discrepancies, coupled with the individualized proof that they

require, demonstrate that certification of this class for all purposes would be inappropriate.  This

reality, however, is not fatal to the class in all respects.  As noted *supra*, *Comcast* demands that a

class's theory of liability track its theory of damages or injury.  Here, regardless of whether an

ASM is a standard, FWW, or hybrid employee, his claim is the same: he is wrongfully classified

as a statutorily exempt employee, and, as such, was never paid the overtime compensation to

which he was entitled.  Thus, unlike in *Comcast*, the injury here—lack of overtime—clearly

stems from one, common harm—the uniform misclassification of all ASMs.  Granted, *Comcast*,

together with *Dukes*, instructs courts that the method by which those damages are calculated may

not serve as an afterthought in the class certification analysis, as whenever damages calculations

require significant degrees of individualized proof, defendants are entitled to respond to and

address such variances—in fact, due process requires it.  But, the Court is "not inclined to extend

*Comcast* beyond its facts and holding," and will accordingly not read *Comcast* as "foreclose[ing]

a district court from certifying a liability only class under Rule 23(c)(4) . . . ."  *Wallace*, 2013

WL 2042369, at *19.

The Court has already determined that the putative class has satisfied its predominance

requirement as to liability.  Nothing in *Comcast* alters this conclusion.  Given the focus on

damages that *Comcast* demands, however, the Court must partially decertify the class, requiring

Plaintiffs, if successful on the merits, to proceed individually on their damages claims.  The

predominance inquiry is a rigorous one.  "As with Rule 23(a), the district court must conduct a

'rigorous analysis' in determining whether Rule 23(b)'s requirements have been met," *Cuevas v. Citizens Financial Grp., Inc.*, No. 12-2832 Civ., 2013 WL 2321426, at *2 (2d Cir. May 29, 2013) (quoting *Comcast*, 133 S. Ct. at 1432), and when "making this determination, the 'district judge is to assess all of the relevant evidence admitted at the class certification stage' and resolve all material disputed facts," *id.* (quoting *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006)).  In its opinion certifying this class of ASMs, the Court did not rest its conclusion on the mere fact that DR's "blanket exemption of all [ASMs], along with the policies set forth in its company wide documents, established that common issues predominate over individual ones." *Id.*  Instead, after careful review of the record, the Court determined that while ASMs' duties indeed vary in some ways—as any group of employees' tasks might—such variance is at the margins and their primary responsibilities, whether properly exempt or not, are ultimately alike.  The Court examined DR's arguments, including those that the New Look stores had altered the ASM position significantly, and ultimately resolved all such issues of fact in favor of the putative class, finding that the ASMs "actually share primary duties such that common issues predominate over individual ones."  *Id.* at *2.

Again, the Court declines to read *Comcast* as disallowing certification as to certain issues, such as liability.  *Accord Wallace*, 2013 WL 2042369, at *19 ("Here, however, Plaintiffs have only sought certification of Classes for a liability determination under Rule 23(c)(4), a subsection of Rule 23 that was not at issue in *Comcast* or even mentioned in the majority opinion. Consequently, *Comcast*'s discussion of the defectiveness of the respondents' damages model when compared to the theories of antitrust impact susceptible to classwide proof does not impact a case such as this where classwide resolution is sought only with respect to liability.").  While Rule 23(c)(4) cannot work an end-run around the requirement that there be a linkage

29

between a class's theory of liability and its theory of damages, or lessen the rigor of a traditional 23(b)(3) analysis, it can act as a tool that is appropriate and useful when classwide proof and predominance exist as to some, but not all issues.  Of course, Rule 23(c)(4) may be applied only "where it is appropriate," meaning courts will decline to employ it to certify discrete issues where, "despite the presence of a common issue, certification would not make the case more manageable." *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 169 (S.D.N.Y. 2003) (quotations and citation omitted).  In other words, Rule 23(c)(4) certification must "materially advance a disposition of the litigation as a whole" in order to be warranted.  *Id.* (same).

Here, certification of the class for liability purposes will clearly advance the litigation in a meaningful way.  Unlike a case in which a class proves, for example, that "defendants collectively breached a duty, [but] must still establish that this breach caused each plaintiff's injury," *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1332 (E.D.N.Y. 1996) (Weinstein, J.), DR's misclassification, if proved, will have necessarily caused a uniform type of injury to class members: namely, the lack of overtime to which all class members would be entitled.  The only remaining question then will be how much each individual is owed—an inquiry that may require varying levels of individualized proof for the reasons discussed above.  Accordingly, this instance is one in which the certification of the liability class is particularly appropriate.  *See, e.g.*, *In re Motor*, 2013 WL 1397125, at *8 ("Plaintiffs ask the Court to certify issue classes under Rule 23(c)(4) that are limited to the 'liability' aspects of their claims.  For purposes of certifying the proposed classes, the 'liability' aspects of plaintiffs' claims include all substantive elements of the claims, including causation and injury.  'Liability' does not include questions of remedy, e.g. damages, injunctive relief and restitution.").  As the *In re Motor* Court noted, Judge

Lungstrum's reasoning from a pre-*Comcast* case discussing Rule 23(c)(4) "applies with equal

force here":

> Even if individualized issues (rather than common issues) were to
> predominate the damage inquiry, the more appropriate course of
> action would be to bifurcate a damages phase and/or decertify the
> class as to individualized damages determinations. In other words,
> even if individualized issues predominate the issue of damages, the
> court believes that common questions nonetheless predominate in
> this case because common questions will govern the more difficult,
> threshold liability issues . . . .

*Id.* at *18 (quoting *In re Urethane Antitrust Litigation*, 237 F.R.D. 440, 452 (D. Kan. 2006)

(citations omitted)); *accord Whirlpool II*, 2013 WL 3746205, at *17 ("This case is different from

*Comcast Corp.* Here the district court certified only a liability class and reserved all issues

concerning damages for individual determination; in *Comcast Corp.* the court certified a class to

determine both liability and damages. Where determinations on liability and damages have been

bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a

liability and damages class because plaintiffs failed to establish that damages could be measured

on a classwide basis—has limited application.").

### C.   *Dukes* and Commonality

DR also moves for reconsideration on the ground that the Court "improperly

distinguished" *Dukes*. (Def.'s Mem. at 1-2.) Citing *Wang v. Chinese Daily News*, 709 F.3d 829

(9th Cir. 2013), DR asserts that there is no longer any doubt "that *Dukes* applies to smaller wage

and hour class actions." (Def.'s Mem. at 7.) In *Wang*, the Ninth Circuit originally affirmed a

grant of class certification and post-trial judgment in favor of a class of reporters for a Chinese-

language newspaper that had alleged violations of FLSA, California labor laws, and California

unfair competition law. *Wang v. Chinese Daily News*, 623 F.3d 743 (9th Cir. 2010). Later, the

Supreme Court granted certiorari, vacated the opinion, and remanded it to the Ninth Circuit for

further consideration in light of *Dukes*. *See Chinese Daily News v. Wang*, 132 S. Ct. 74 (2011).

In early March 2013, the Ninth Circuit reversed its earlier opinion, noting that despite

the fact that the *Dukes* class and the class which was certified by the district court in *Wang* were

"factually distinguishable," remand was necessary in light of "potentially significant differences

among the class members." *Wang*, 709 F.3d at 834. Accordingly, the Ninth Circuit vacated the

district court's commonality finding for a more rigorous analysis in light of *Dukes*. *Id.*

Additionally, applying *Dukes*' holding that individual monetary claims have no place within

Rule 23(b)(2) certification, but rather, belong in Rule 23(b)(3), the *Wang* court remanded the

case to the district court "for reconsideration of the propriety of class certification under Rule

23(b)(3)." *Id.* at 835. In particular, the Ninth Circuit was troubled by the lower court's reliance

on the Chinese Daily News' uniform application of corporate policies to all employees,

explaining that a "presumption that class certification is proper when an employer's internal

exemption policies are applied uniformly to the employees" is inappropriate. *Id.* (quotations and

citations omitted). The Ninth Circuit, however, also reiterated the policy that bolsters this

Court's conclusions in the instant case: "Rule 23 provides district courts with broad authority at

various stages in the litigation to revisit class certification determinations and to redefine or

decertify classes as appropriate." *Id.* at 836.

DR misinterprets this Court's analysis of *Dukes*. In its prior opinion, the Court

distinguished *Dukes* not to suggest that its holding did not apply in wage and hour cases such as

this. Instead, the differences were meant to highlight, as the Ninth Circuit did in its *Wang*

decision, the myriad differences between the *Dukes* class and the ASM class as a means of

explicating why class certification was inappropriate in the former instance, but nevertheless

appropriate here.  *Dukes* made clear, and the Second Circuit has since reiterated, that a district court's commonality analysis must be rigorous.  *See Cuevas*, 2013 WL 2321426, at *1 ("The Supreme Court repeatedly has made clear that a district court must undertake 'a rigorous analysis' in determining 'that the prerequisites of Rule 23(a) have been satisfied.'" (quoting *Dukes*, 131 S. Ct. at 2551) (quotations and citation omitted)).  There is nothing in *Comcast*, however, that suggests that this Court's commonality analysis, as applied to Plaintiffs' *liability* claims, misapprehended precedent.  As required by *Dukes*, the Court rigorously examined the record, the differences in ASMs' duties, DR's corporate policies, the allegations of misclassification, and the capability of the common questions cited by Plaintiffs to generate common answers.

DR is correct that *Comcast* brings damages to the forefront of the class certification inquiry—a holding that, when combined with *Dukes*' discussion of trial by formula, suggests that where individualized damages questions so predominate over damages questions capable of classwide proof, certification is inappropriate and raises due process concerns for defendants.  However, this particular concern has been addressed by the Court's conclusion that Rule 23(c)(4) is an appropriate mechanism by which to certify the ASM class as to liability only, decertifying it as to damages.  Put another way, *Dukes* clearly applies to wage and hour claims with equal force as it applies to cases brought under Title VII.  And this Court never held differently.  Nevertheless, with respect to the liability class, for the reasons stated in the prior opinion, as well as in light of the vast differences between the *Dukes* class and the ASM class here, the Court's commonality determination stands.

**IV.      Conclusion**

For the foregoing reasons, Defendants' motion for reconsideration is GRANTED in part and DENIED in part.  Plaintiffs' class remains certified as to liability, but is decertified for damages purposes, in light of the need for individualized proof necessary to determine monies potentially owed each ASM.

The Clerk of Court is directed to close the motion at docket entry number 108.

SO ORDERED.

Dated:  New York, New York
         August 8, 2013

                                                    _____
                                                         J. PAUL OETKEN
                                                    United States District Judge

34