```
 UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
MANI JACOB, et al., individually and on behalf              :
of all others similarly situated,                           :
                                  Plaintiffs,               :    11-CV-0160 (JPO)
                                                            :
                        -v-                                 :    OPINION & ORDER
                                                            :
DUANE READE, INC. and DUANE READE                           :
HOLDINGS INC.,                                              :
                                  Defendants.               :
----------------------------------------------------------- X
```

J. PAUL OETKEN, District Judge:

      Plaintiffs in this case allege that Duane Reade, Inc., and Duane Reade Holdings (collectively, "Duane Reade"), failed to compensate assistant store managers ("ASMs") for hours worked in excess of 40 hours per week, in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). The Court conditionally certified a FLSA collective action on January 27, 2012, and it certified a NYLL class under Federal Rule of Civil Procedure 23(b)(3) on March 20, 2013. *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y. 2013); *Jacob v. Duane Reade, Inc.*, No. 11-CV-0160, 2012 WL 260230 (S.D.N.Y. Jan. 27, 2012). In August 2013, the court granted in part a motion for reconsideration, partially decertifying the class as to damages but allowing it to proceed as to liability. *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y. 2013); *see* Fed. R. Civ. P. 23(c)(4). Defendants appealed, and on February 10, 2015, the Second Circuit affirmed this court's class certification determination by summary order. *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3 (2d Cir. 2015).

      Discovery in this case has now closed, and Duane Reade moves to decertify the class and decertify the collective action. (Dkt. No. 171.) For the following reasons, the motion is denied.

1

I.   **Discussion**

Familiarity with the underlying facts and procedural history, as described in the Court's prior opinions, is presumed. Duane Reade seeks decertification of both the Rule 23 class and the FLSA collective action. This opinion addresses each in turn.

A.   **Rule 23 Class**

The Court has certified a Rule 23(c)(4) class as to liability under the New York Labor Law. *See Jacob*, 293 F.R.D. at 593-94; *Jacob*, 289 F.R.D. at 411 (citing N.Y.L.L. § 650; 12 N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2). Rule 23 of the Federal Rules of Civil Procedure allows a district court to certify a class "with respect to particular issues." Fed. R. Civ. P. 23(c)(4); *see Jacob*, 293 F.R.D. at 589 (noting the "longstanding principle in this Circuit that courts may certify a class as to liability, but not damages, utilizing Rule 23(c)(4), so long as the proposed liability class meets the requirements of Rule 23(a) and (b)."). In so doing, a district court must "conduct a 'rigorous analysis' that may 'overlap with the merits of the plaintiff's underling claim.'" *Jacob*, 602 F. App'x 5 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)); *see Comcast Corp. v. Behrend*, -- U.S. --, 133 S. Ct. 1426, 1432 (2013).

Once a class is certified, "Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate." *Jacob*; 293 F.R.D. at 594 (quoting *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 836 (9th Cir.), *superseded on other grounds by* 737 F.3d 538 (9th Cir. 2013)); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). While "[a] court may decertify a class if it appears that the requirements of Rule 23 are not in fact met . . . [it] may not disturb its prior findings absent some

significant intervening event or a showing of compelling reasons to reexamine the question." *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Such a compelling reason includes "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (quoting *Gulino v. Bd. of Educ.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd*, 555 F. App'x 37 (2d Cir. 2014)); *see Stinson v. City of New York*, 2014 WL 4742231, at *1 (S.D.N.Y. Sept. 23, 2014) (collecting cases). Absent such a showing, "the factual underpinnings of a court's prior certification order are deemed to be law of the case." *Stinson*, 2014 WL 4742231, at *2 (internal quotation marks and citation omitted). Courts also consider "the progression of the litigation" before decertifying a class, to avoid prejudice to class members, *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011), and consider whether a "less draconian" step like "limiting the scope of the class" might suffice, *Mazzei*, 308 F.R.D. at 106 (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)).

After over a year of class certification discovery, the Court certified an issue class as to "whether Duane Reade misclassified its employees as exempt from New York's overtime requirements." *Jacob*, 602 F. App'x at 6. Duane Reade now seeks to relitigate the class certification issue by cobbling together previously reviewed evidence, previously available evidence, and scraps of new evidence. It argues that this mélange shows that the class no longer satisfies the commonality and predominance requirements of Rule 23(a)-(b). The attempt is unconvincing.

### 1. Commonality

"A party seeking class certification must satisfy Rule 23(a)(2)'s requirement that there be 'questions of law or fact common to the class.'" *Jacob*, 602 F. App'x at 6 (quoting Fed. R. Civ.

P. 23(a)(2)).  This requirement entails a showing that the claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at at 350.  "The claims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of putative class members."  *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *see Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (explaining that plaintiffs must have "suffered the same injury" (quoting *Wal-Mart*, 564 U.S. at 350)).

As mentioned above, the common question in this case is "whether Duane Reade misclassified its employees as exempt from New York's overtime requirements."  *Jacob*, 602 F. App'x at 6; *see* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c) (describing the elements of the administrative and executive exemptions to New York Labor Law).  The Court held previously that this question is "subject to classwide resolution" based on evidence showing that "(i) Duane Reade uniformly classifies all ASMs as exempt without an individualized determination of each ASM's job responsibilities, and (ii) Duane Reade ASMs carry out their duties pursuant to a uniform policy, uniform training, and uniform procedures across all stores."  *Jacob*, 602 F. App'x at 6.  These common policies show "significant elements of proof that are common across all class members, and that do not require individualized examination."  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (Lynch, J.).  Deposition testimony from Duane Reade's former director of training and development and "extensive deposition testimony of ASMs" confirmed "that all ASMs share similar primary job responsibilities."  *Jacob*, 602 F. App'x at 6.  The Court conducted a thorough analysis of the

4

"myriad" deposed ASMs and found that "the weight of the evidence tends to show that all ASMs share similar primary job responsibilities, and also have a similar understanding of their role in the [Duane Reade] organization." *Jacob*, 289 F.R.D. at 419; *see id.* at 419-422. This evidence tended to yield a common answer to the question whether ASMs satisfied an exemption to New York Labor Law.

Duane Reade resists this conclusion primarily by relying on the complete discovery record. It argues that this record shows "fundamental differences" that "require an individualized inquiry into each class member's actual duties." (Dkt. No. 172 at 23.) Their motion relies almost entirely on deposition testimony and self-evaluations that Duane Reade has had assistant store managers complete since the start of this litigation. However, consideration of the full discovery record only reaffirms that Plaintiffs raise a common contention amenable to classwide resolution.

    a.    **Deposition Testimony**

Plaintiffs argue—and Duane Reade does not contest—that all depositions of ASMs now in the record were completed before Duane Reade filed its motion for reconsideration, and most were completed before Plaintiffs' original motion for class certification. (*See* Dkt. No. 180 ¶¶ 2-5.) That is unsurprising, since the parties had the benefit of class certification discovery before the filing of their motions. And it also shows that the depositions are not "new" in any sense sufficient to disturb the Court's earlier rigorous review of the record.

In any event, upon further review, the ASM depositions remain consistent with the Court's earlier analysis. *Jacob*, 289 F.R.D. at 415-16, 419-422. For example, Duane Reade's primary argument is that some ASMs are exempt under the administrative or executive exemptions to the NYLL overtime requirements, or a combination thereof. *See* N.Y. Comp.

Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(i)-(ii).  It argues that the deposition testimony reveals wide variation in the primary duties of each ASM, requiring an individualized inquiry into their primary duties and the possible exemptions.

The Court rejected this same argument in its original opinion in 2013.  *See Jacob*, 289 F.R.D. at 415, 419; *see also Jacob*, 602 F. App'x at 6.  The exemption issue was part of the Court's inquiry into "whether Plaintiffs have established, by a preponderance of the evidence, that the primary duties of [Duane Reade] ASMs are sufficiently similar to not only allow for generalized proof, as commonality demands, but also to outweigh those issues subject only to individualized proof."  *Jacob*, 289 F.R.D. at 419.  Much of the evidence in Duane Reade's present brief it offered at that time for the same proposition.  *Compare, e.g.*, Dkt. No. 100 at 8 & n.26 *with* Dkt. No. 172 at 7, 11 (identifying ASMs who might be subject to the administrative exemption).  And to the extent that it relies on new evidence, that evidence only bolsters the Court's earlier conclusion.

For example, the Opinion and Order certifying the class explains that the deposed ASMs described their jobs "as a mix of a similar set of duties, including working the cash register, assisting customers, stocking shelves, arranging products in concert with the Plan-O-Gram, ensuring that the store was clean, packing out the store or trucks, and handling money."  *Jacob*, 289 F.R.D. at 419; *see id.* at 420 ("[I]t appears that most ASMs feel generally responsible for the management of the store, but recognize that the [store manager] or district manager . . . has the final word on [supervision and scheduling]").  It also notes that, while some ASMs "have more of a supervisory role than others," they acted as the primary manager "only sporadically when the [store manager] was away on vacation, or indisposed."  *Id.* at 420.  Of the eighteen ASMs Duane Reade now alleges have management as their primary duty, the 2013 Order refers to the

6

testimony of nine of them—Jacob, DeMarco, Washington, Bharat, Faruk, Mehta, Forde, Gaynor, and Ifill. The testimony of the remaining ASMs is consistent with that conclusion. *See* Dkt. No. 180 Ex. T at 53:2-8; 56:6-57:19, 116:17-20; 144:23-145:10 (explaining that Arias as an ASM operated the register, packed out trucks, and stocked the store); Dkt. No. 173 Ex. 36 at 86:15-89:24 (explaining that Ban acted as a manager in a limited capacity while the store manager was absent, and that his regular work included implementing Plan-O-Grams and restocking the shelves); Dkt. No. 180 Ex. F at 60:14-25; 86:20-87:2; 139:4-16 (explaining that Crooks spent "[m]ost of the day" dealing with customers, including by working the registers, and that she also spent two hours a day sweeping and mopping, and further time removing recalled products from the shelves); *id.* Ex. R at 66:7-15; 150:21-154:18, (explaining that Vuchetich processed returns, stocked shelves, packed out trucks, handled money, and implemented Plan-O-Grams); Dkt. No. 173 Ex. 33 at 37:20-38:22 (explaining that Allen packed out trucks and implemented Plan-O-Grams); Dkt. No. 180 Ex. YY at 41:2-23 (explaining that Allen's store manager gave her and shift leaders the same responsibilities, and they "all have to do the same thing for the store to run properly"); *id.* Ex. U at 126:15-127:16 (explaining that Maharajh spends about four hours a day cleaning the store, two hours a day running cash registers, and between two hours and several full days a week implementing Plan-O-Grams); *id.* Ex. XX at 40:16-24; 42:7-17 (explaining that Cedeno's job was to fix things and check things, and generally to ensure that the district manager and store manager's instructions were implemented); Dkt. No. 173 Ex. 41 at 48:10-49:14 (explaining that Cedeno had some disciplinary and hiring authority only during a five-month period in which the store manager was absent following surgery); Dkt. No. 180 Ex. V at 28:1-12, 31:12-22, 118:11-24, 137:11-16, 184:6-15, 206:13-24 (explaining that Scagnelli's job entailed helping customers, packing out trucks, doing recalls and returns, helping with Plan-O-Grams,

cleaning, and working with registers, and that Scaganelli spent the majority of the time moving items around the store); *id.* Ex. W at 50:7-51:9, 52:19-54:18, 55:6-56:20 (explaining that Neuner spent substantial time packing out trucks, helping customers and processing refunds, and implementing Plan-O-Grams). To the extent that there are differences, those differences reflect "minor deviations" that "do not eliminate the overriding consistencies present throughout all the testimony." *Jacob*, 289 F.R.D. at 421.

The same is true with regard to ASMs' role in hiring, termination, and other status changes. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(i)(c) (explaining that, under the NYLL, an element of the executive exemption is whether the employee "has the authority to hire or fire other employees or whose suggestions and recommendations . . . are given particular weight"); 29 C.F.R. § 541.100 (same under the FLSA); *id.* § 541.105 (describing factors showing that an employee's suggestions are given "particular weight"); *Jackson v. Bloomberg, L.P*, 298 F.R.D. 152, 160 (S.D.N.Y. 2014) ("FLSA's exemptions are incorporated into the NYLL."). In the 2013 decision, the Court found that "all ASMs have experienced that their duties are cabined somewhat by the ultimate direction of the [store manager] or human resources—no matter whether they pass on information related to hiring or terminations, or not . . . ." *Jacob*, 289 F.R.D. at 420. Duane Reade now cites 25 ASMs who it says had varying roles in hiring, firing, promotion, and other changes in status. (Dkt. No. 172 at 6-7.) Evidence from all except six were cited in Duane Reade's previous motion. (Dkt. No. 100 at 7 & nn. 11-14.) The testimony of each of those six is consistent with the Court's earlier conclusion and suggests no special emphasis on the recommendations of ASMs. *See* Dkt. No. 173 Ex. 35 21:11-22:24 (explaining that Arias made recommendations and passed on information to his store manager, but did not know if the store manager acted on those recommendations); Dkt. No. 180

Ex. X 33:23-40:12, 206:2-211:1 (explaining that Jimenez was involved in hiring while his store manager was on medical leave, but even then he never hired candidates without a store manager's approval); Dkt. No. 173 Ex. 34 at 21:13-22:5, 24:9-28:12 (explaining that Apana made recommendations to the store manager, but that "it wasn't up to" Apana); *id.* Ex. 54 at 51:11-55:10, 136:1-8, 170:1-14 (explaining that Ifill sat in on 10-15 interviews and gave "feedback" on hiring, promotion, and termination decisions, but Ifill was not asked "do you think a person should be hired" and often did not know if those individuals were hired); *id.* Ex. 71 at 252:2-8 (identifying only that Saleem lacked authority to hire or terminate employees); *id.* Ex. 42 at 37:2-11 (explaining that Chiarappa made no recommendations, and that the store manager did the hiring). Duane Reade also offers deposition testimony from four ASMs, for whom only declarations were included with their earlier briefing. The testimony of three of these ASMs similarly confirms the Court's earlier conclusion. *See* Dkt. No. 173 Ex. 74 at 88:8-90:7, 165:17-166:6, 178:22-179:11 (explaining that Vuchetich conducted about three interviews and recommended a termination and a promotion, but that the store manager made hiring and termination decisions in conjunction with human resources); Dkt. No. 180 Ex. F at 116:22-119:13 (explaining that Crooks made hiring recommendations about twice a month, which were followed less than half the time); *id.* Ex. NN at 113:3-118:24, 125:2-19 (explaining that Baptiste conducted interviews as part of his professional development, with the store manager making final decisions).

The only exception is Jessica Kudrna, who was trained by Duane Reade to be a "hiring manager." From 2009 to 2012, a subset of Duane Reade's stores in Manhattan were designated as hiring stores, conducting the hiring and interviewing for several other stores in their district. (Dkt. No. 172 at 10.) A subset of the ASMs in those stores—including Kudrna—were

designated as "hiring managers." Kudrna testifies that she did hundreds of interviews and hired for certain Duane Reade positions without further oversight. *See* Dkt. No. 173 Ex. 60 at 19:22-20:16, 50:12-20, 51:13-18.

The other testimony regarding hiring managers is consistent with the above description of ASM roles in hiring, rather than Kudrna's description. Duane Reade identifies a district manager, Joseph Losos, who suggests that hiring ASMs were routinely involved in hiring. (Dkt. No. 173 Ex. 63 at 140:3-142:5.) That testimony's later discussion of current practice suggests that the involvement of hiring ASMs in "doing hiring" is similar to the role of ASMs at many stores now. (*id.* at 140:21-142:25.) Duane Reade also points to testimony from Losos that it says "identifie[s] three ASMs in his district who were heavily involved in serving as hiring managers for all the stores in his district." (Dkt. No. 172 at 11.) The testimony itself, however, only identifies them as "participat[ing] in the hiring process" and "interviewing" at a store that was "doing hiring and recruiting for a number of stores in the district." (Dkt. No. 173 Ex. 63 at 222:24-225:19.) The interview notes, which Duane Reade claims corroborate their argument, show that the ASMs asked questions and took notes in the interviews, but the notes are often purely descriptive, with the assessment and rating portions of the forms frequently left blank. (*Id.* Ex. 3-4.)

Even if the record showed that hiring ASMs were more meaningfully involved in hiring than other ASMs, that would only go to one element of the executive exemption, *see* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14, and only for a small proportion of the class that has been certified. As of 2011, Duane Reade had trained approximately fifteen to twenty ASMs as hiring managers. (Dkt. No. 180 Ex. DD 36:20-24. *But see* Dkt. No. 173 Ex. 5.) By comparison, the class of ASMs certified includes at least 750 members. *Jacob*, 289 F.R.D. at 413. Finally, if

hiring ASMs were situated differently from other ASMs, the proper remedy would be to narrow the class to exclude them, not to decertify the class—relief which Duane Reade does not seek.

The level of involvement described in the above deposition testimony is consistent with the 2013 testimony from ASMs about their role in hiring in individual stores: some involvement in interviews, but cabined by the store and district managers, and occasional recommendations that may or may not have been affirmed without further discussion with the ASMs. Those facts may or may not demonstrate that ASM recommendations were given particular weight, 29 C.F.R. § 541.105, but they are generally consistent across the class. Duane Reade has not identified record evidence—on this, their fourth opposition to class certification—showing that ASMs are so differently situated that there are no common questions for resolution. *See Jacob*, 289 F.R.D. at 415 ("[C]ommonality does not require plaintiffs to show that class members perform identical duties—an impossible task," but only that they are "largely consistent . . . , which lend themselves to common determinations.") Kudrna, the only ASM to make independent hiring decisions, is an outlier who does not defeat class certification. *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 644 (S.D.N.Y. 2013) ("Of course, in any group, there will always be outliers.").

Simply put, the Court made a finding that the ASMs are similarly situated such that they raise common questions as to liability. There is no new deposition testimony justifying reconsideration of that finding. And on a new review of the record, that finding is strengthened rather than weakened by the deposition testimony Duane Reade now marshals in its motion. Duane Reade's repeated suggestions that the ASM depositions show wide variation across the elements of the various exemptions are unsupported by the record.

11

b.     **Other Evidence**

Aside from the depositions, Duane Reade emphasizes two new sets of data.  First, beginning in 2013, Duane Reade instructed ASMs to complete "self-evaluations." (Dkt. No. 172 at 13.)  Many of these self-evaluations describe varying degrees of management responsibilities.  For example, Norman Azad's self-evaluation says that he "assist[ed the] management team," "[e]nsure[d] compliance to applicable labor laws, legal requirements, Company policy, and the collective bargaining agreement," and "directly supervised, develop[ed], train[ed], manage[d] and motivate[d] non-exempt store associates in accordance with Duane Reade policies and procedures."  (Dkt. No. 173 Ex. 12.)

The Court accords these self-evaluations little weight.  ASMs testified that they understood Duane Reade would use the self-evaluations in future promotion decisions.  (Dkt. No. 180 Ex. U at 131:15-132:6, Ex. Y at 116:22-117:21.)  They are functionally resumes—indeed, some look like resumes (Dkt. No. 173 Ex. 12)—"designed to enhance the employee's duties and responsibilities in an effort to obtain a job." *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 689 n.2 (6th Cir. 2001); *see Ozawa v. Orsini Design Assocs., Inc.*, No. 13-CV-1282, 2015 WL 1055902, at * 6 n.4 (S.D.N.Y. Mar. 11, 2015).  While resumes may in some circumstances be informative, for example when created outside the shadow of litigation, these likely contain puffery.  Some ASMs even reported that they filled out the self-evaluations using a Duane Reade-provided template, or that they did not reflect the ASMs' actual duties.  (Dkt. No. 180 Ex. Y at 118:6-119:6 (identifying the written template), Ex. Z at 59:7-65:15 (explaining that Chiarappa wrote "managing store," but that she did not actually manage the store, and she wrote it because it was on a template or following the store manager's instructions).)  Duane Reade's emails show that it asked ASMs to complete the self-evaluations due to an "ulterior motive[]":

12

"to show that [the ASMs] believe that they are in fact functioning at the exempt level . . . in their writing with their signature." (Dkt. No. 180 Ex. III.)

Duane Reade argues that the "wide variety in the ASMs own descriptions of their experiences" shows that the ASMs were not instructed by Duane Reade as to how to answer the self-evaluations. (Dkt. No. 183 at 3.) It also emphasizes that the self-evaluations ask "only for current job experience" and are "unedited by attorneys." (*Id.*) This variation, in combination with the deposition testimony cited above and the context in which ASMs completed the evaluations, may just as readily demonstrate that some ASMs were more willing to engage in puffery or to follow Duane Reade's templates than others. Accordingly, the Court concludes that the self-evaluations are of lesser probative value than, and are outweighed by, the deposition testimony and the evidence of Duane Reade's practices and policies for ASMs and store management.

Duane Reade also observes that the Department of Labor audited one Duane Reade store in 2010. The Labor Department concluded that the store manager and ASM at that store "direct the work of EEs, set work schedules, discipline EEs, select[] & train[] EEs, appraise EEs productivity, etc. The[y] each manage[] the equivalent of 2 or more full-time EEs." (Dkt. No. 173 Ex. 10 at D217339.) The DOL audit does not materially alter the Court's earlier analysis for three reasons. First, this work, characterized as the *joint* work of the store manager and ASM, is largely consistent with the deposition testimony of the ASMs. They agreed that they conduct many of these tasks, under the supervision and cabined by the choices of the store manager. *See Jacob*, 289 F.R.D. at 420 (noting that ASMs are sometimes "materially involved in scheduling and supervision" but that the store manager "has the final word," and that ASMs "served as the primary manager on site . . . only sporadically when the [store manager] was away on vacation,

13

or indisposed."). The DOL audit does not disaggregate the role of the ASM except as to management of two or more employees, nor does the investigator seem to have even talked with the ASM at that store.

Second, insofar as it differs from the Court's rigorous review of the deposition testimony and Duane Reade's corporate policies and practices, it is evidence concerning only one ASM that does not outweigh the other evidence of common issues. Third, the DOL's determination that the ASMs are exempt employees goes to the merits of Plaintiffs' claims, not to whether they are amenable to classwide resolution. Indeed, Duane Reade has attached to their reply brief Department of Labor audits from about thirty other Duane Reade locations from 2002-03, before the class period here, which also found ASMs exempt. (Dkt. No. 183 at 3 n.1; Dkt No. 184.) That evidence is of limited use in evaluating the status of ASMs during the class period. But the fact the Department of Labor has consistently found ASMs to be exempt tends to show that the status of ASMs is amenable to classwide resolution.

### 2. Predominance

Duane Reade also argues that the common questions of law or fact do not "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b). "The predominance requirement is satisfied if resolution of some of the legal and factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2015) (citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)). This requirement is "more demanding than Rule 23(a)." *Johnson*, 780 F.3d at 138 (citing *Comcast*, 133 S. Ct. at 1432).

14

The Court concluded after careful review of the deposition testimony of ASMs and the other evidence in the record that common questions predominate over individual ones as to liability. *Jacob*, 289 F.R.D. at 419. As described above, there are few developments in the record that justify revisiting that decision. Alternatively, a review of the record since the 2013 decision has reinforced the Court's prior conclusion as to the similarity of class members. By the same token, this review of the record reinforces the Court's conclusion that the common questions overwhelm individualized differences as to class members. The weight of the evidence continues to show "that all ASMs share similar primary job responsibilities, and also have a similar understanding of their role in the [Duane Reade] organization." *Id*.

In its reply brief, Duane Reade complains that it is "entitled to ask" individual ASMs about their roles and that the case "cannot be tried by representative evidence." (Dkt. No. 183 at 4, 6-7). As the Second Circuit has explained in *Myers*, the question whether members of a putative class were misclassified or are subject to an exemption is not "*inherently individualized* . . . , such that class treatment will never be appropriate in exemption cases." 624 F.3d at 549 (citing *Damassia*, 250 F.R.D. 152); *see id.* at 551 (explaining that an exemption defense is the "mirror image" of plaintiffs' claim). A class may be certified where the Court examines the duties employees actually perform and concludes that "they involve evidence tending to show that the plaintiffs' jobs were similar in ways material to the establishment of the exempt criteria." *Id.* at 549 (citing *Damassia*, 250 F.R.D. at 156-61 (certifying Rule 23 class where job duties were "largely consistent")). This is such a case. *Cf. Damassia*, 250 F.R.D. at 161 ("[T]he record establishes that the responsibilities of assistant managers are derived and controlled by policies and protocols issued by Duane Reade, and do not vary materially from store to store.").

The Second Circuit's recent decision in *Glatt v. Fox Searchlight Pictures Inc.*, 811 F.3d 528 (2d Cir. 2015), is not to the contrary. There, the Second Circuit vacated a district court opinion certifying a class of unpaid interns arguing that they should have been paid as employees under the FLSA and NYLL. *Id.* at 531-32. The Circuit held that "Defendants' undisputed evidence demonstrated that the various internship programs it offered differed substantially across the many departments and four [employer] divisions included in the proposed class." *Id.* at 539. Concordantly, evidence that the employer sometimes replaced employees with unpaid interns would be insufficient to show whether the internship program created employment relationships, since many individualized questions remained. *Id.* Here, the record evidence shows that the primary duties of ASMs are substantially similar across Duane Reade stores, including with respect to the elements of Duane Reade's claimed exemptions. This case satisfies the description of a certifiable class in *Myers*, as explained above and cited approvingly in *Glatt*. *See id.* (citing *Myers*, 624 F.3d at 548).

Finally, the Court observes that this case was first filed in January 2011. (Dkt. No. 1.) The class was certified following extensive class certification discovery, and that class certification has already been affirmed on appeal. Potential opt-out plaintiffs have been notified of this action, and the last plaintiff to opt in to the FLSA collective action occurred over a year ago, in January 2015. (Dkt. No. 165.) The Court is mindful that "an eve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests." *Gortat v. Capala Bros., Inc.*, No. 07-CV-3629, 2012 WL 1116495, at *2 (E.D.N.Y. Aug. 3, 2012) (citing *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984)), *aff'd*, 568 F. App'x 78 (2d Cir. 2014); *Langley v. Coughlin*, 715 F. Supp. 522, 552 (S.D.N.Y. 1989); *see Romero v. La*

16

*Revise Assocs., L.L.C.*, 968 F. Supp. 2d 639, 648 (S.D.N.Y. 2013) (noting the six-year statute of limitations under New York Labor Law).

Duane Reade's second bite at the apple fairs no better than its first. The ASMs at Duane Reade remain similarly situated, such that there are common questions as to whether they were misclassified as exempt. While there are individualized issues in this case—it has already been decertified as to damages—they are overwhelmed by the Plaintiffs' common questions. Class resolution of those questions is superior to other methods for adjudicating these issues. The motion to decertify the Rule 23 class is denied.

### B. The FLSA Collective Action

"The Second Circuit has endorsed a two-step process for determining whether to proceed collectively under § 216(b)," the FLSA's collective action provision. *Jacob*, 2012 WL 260230, at *3 (citing *Myers*, 624 F.3d at 554-55). At step one, plaintiffs must make a "modest factual showing that they were victims of a common policy or plan that violated the law" and so are "similarly situated." *Id.* (quoting *Myers*, 624 F.3d at 555) (internal quotation marks omitted). At step two, once discovery is complete and plaintiffs have opted in, "courts conduct a more stringent 'second tier' analysis upon a full record to decide whether the additional plaintiffs are similarly situated to the original plaintiffs." *Id.* (quoting *Indergit v. Rite Aid Corp.*, No. 08-CV-9361, 2010 WL 2465488, at *4 (S.D.N.Y. June 16, 2010)). "The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers*, 624 F.3d at 555.

In determining whether to decertify a FLSA collective action, district courts in this Circuit look to "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness

17

and procedural considerations counseling for or against [collective action treatment]." *Indergit*, 293 F.R.D. at 639 (alteration in original) (quoting *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011)). It is often said that "the 'similarly situated' requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate,'" even at the second stage of the litigation. *E.g. Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339, 2014 WL 5039431, at *8 (S.D.N.Y. Sept. 29, 2014); *McGlone v. Contract Collars, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014); *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08-CV-7813, 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011). "[C]ourts facing parallel motions to decertify an FLSA collective action under § 216(b) and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis." *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 298-99 (S.D.N.Y. 2015) (citing *Gardner v. Beef Props., Inc.*, No. 07-CV-2345, 2013 WL 1629299, at *6 n.3 (E.D.N.Y. Mar. 25, 2013)).

This Court certified an FLSA collective action at step one in 2012. *Jacob*, 2012 WL 260230, at *9. There are now over 250 opt-in plaintiffs. Duane Reade now moves to decertify the class.

Analysis of this issue is not constrained by the law-of-the-case issues limiting Duane Reade's motion to decertify the Rule 23 class. Nonetheless, for the reasons described above and in the prior opinions in this case, the Court finds that the opt-in Plaintiffs are similarly situated. As discussed above and in the 2013 opinion, review of ASMs' depositions shows that the factual and employment settings of the individual plaintiffs are substantially similar. Plaintiffs have also made a "persuasive showing" that the original and opt-in plaintiffs were subject to "a systematically-applied company policy or practice . . . ." *Pefanis v. Westway Diner, Inc.*, No.

08-CV-002, 2010 WL 3564426, at *4 (S.D.N.Y. Sept. 7, 2010). In particular, the opt-in plaintiffs were subject to a blanket classification as exempt, and their jobs were defined by comprehensive corporate procedures and policies including uniform training, uniform job descriptions, and uniform procedures. *Jacob*, 289 F.R.D. at 414-15. They need not be identical—an "impossible task," *id.* at 415—to be similar enough for certification as a collective action. Second, as discussed above and previously, the Plaintiffs are vulnerable to the same common defenses. Whether characterized as the administrative exemption, executive exemption, or a combination exemption, Duane Reade will be able to argue that the Plaintiffs' swath of duties are exempt. *See id.* at 418-21; *cf. Myers*, 624 F.3d at 549 ("[D]istrict courts in this Circuit have certified classes on state law claims that turn on the question of FLSA exemption for a particular group of employees."); *see also* 29 C.F.R. §§ 541.100, 541.200, 541.708; *Jackson*, 298 F.R.D. at 160 ("FLSA's exemptions are incorporated into the NYLL."). Plaintiffs' primary duties are similar, and Duane Reade can argue that this set of duties renders them exempt. Finally, fairness and procedural considerations weigh in favor of certifying the collective action. As with the Rule 23 class, for most opt-in plaintiffs, "pursuing this litigation individually would be a hindrance rather than a boon." *Jacob*, 289 F.R.D. at 423. Further, as the Court has certified a Rule 23 class, allowing the FLSA collective action to proceed as well is fair and procedurally efficient. *See Hart v. Rick's Cabaret Intern., Inc.*, 60 F. Supp. 3d 447, 473 n.12 (S.D.N.Y. 2014). The cases Duane Reade cites are not to the contrary, for the courts there found substantial disparities in the Plaintiffs' duties that overwhelmed the common corporate policies. *See Stevens v. HMSHost Corp.*, No. 10-CV-3571, 2014 WL 4261410, at *7 (E.D.N.Y. Aug. 27, 2014) (decertifying a collective action because deposition testimony "varies significantly with

19

respect with respect to the factors relevant to the FLSA exemptions"); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 578-79 (E.D. La. 2008) (similar).

Accordingly, the motion to decertify the collective action is denied.

## II. Conclusion

For the foregoing reasons, Defendants' motions to decertify the Rule 23 class and the FLSA collective action are DENIED.

SO ORDERED.

Dated: June 9, 2016
      New York, New York

                                              J. PAUL OETKEN
                                              United States District Judge